**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Connie WALKER, Antoinette Lloyd, Ronald Jackson, also known as Cuzzo, Mario H. Lloyd, and Charles Lloyd, Defendants–Appellants.**

Nos. 90–3577, 90–3578, 90–3579, 90–3713, 90–3779 and 92–1981.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 13, 1994.

Decided May 31, 1994.

Order Denying Rehearing and Motion to Amend July 29, 1994.

Allen E. Shoenberger, Loyola University School of Law, Kerrie A. Lethbridge (argued) Chicago, IL, for Ronald Jackson.

Allan A. Ackerman (argued), Chicago, IL, for Mario Lloyd.

Michael E. Deutsch, Jeffrey H. Haas (argued), Peoples Law Office, Chicago, IL, for Charles Lloyd, Connie Walker and Antoinette Lloyd.

Zaldwaynaka L. Scott, Andrea L. Davis, Asst. U.S. Attys., Office. of the U.S. Atty., Criminal Div., Chicago, IL, Barry R. Elden, Asst. U.S. Atty., Matthew C. Crowl (argued), Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for U.S.

Mario Lloyd, pro se.

Before CUMMINGS, ESCHBACH, and FLAUM, Circuit Judges.

ESCHBACH, Circuit Judge.

This is a consolidated criminal appeal by five defendants who were convicted of various drug, money laundering, and conspiracy offenses. For the reasons below, we affirm on all grounds. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## I.

Assisted by his co-defendants in various capacities, Mario Lloyd captained a major cocaine distribution operation with a product distribution of hundreds of kilograms of cocaine in Chicago and Milwaukee, revenues of $20–30 million and profits over $2 million. Some of Mario's former workers and distributors, facing stiff sentences for their own convictions, cooperated with the government and testified at trial about Mario's operation. Mario employed several people, including appellants Ronald Jackson and Charles Lloyd, to distribute large amounts of cocaine. Mario purchased his cocaine from Colombian drug sources and others and then called upon his brother Charles and appellant Jackson, among others, to distribute the cocaine using such clever devices as cars with secret, James Bond-like compartments to store cocaine and cash. From his operations Mario garnered fantastic sums of cash, which he needed in some fashion to hide from authorities.

To help him launder his cash, Mario employed several family members, including his own mother, appellant Connie Walker, and his sister, appellant Antoinette Lloyd, to purchase condominiums, townhouses, expensive cars, furs, and jewelry. Although the Lloyd family and friends lived richly, spending their hoards of cash while avoiding scrutiny by the government proved more difficult than they might have originally imagined. Mario first encountered our statutory barriers to large cash transactions when he and his mother bought a $53,000 condominium using cash in a grocery sack they brought to the closing. The bank representing the seller, although probably pleased with Mario's excellent credit, nevertheless informed him and Walker of its obligation to report the transaction to the Internal Revenue Service. In an effort to make an end run around the bank's reporting obligations, prior to his next real estate purchase Mario and his mother enlisted other family members, including Antoinette, to buy separate money orders and cashier's checks, each in amounts less than $10,000, from several different banks and currency exchanges. With a stack of 76 cashier's checks and money orders obtained by Walker, Walker's sister, Walker's cousin, and Antoinette, Mario purchased a townhouse in the name of the four women for $161,900.

What Mario and his crowd could not spend, they stashed in lock boxes. Pursuant to search warrants, federal agents recovered approximately $1.25 million in cash from three different bank lock boxes. Notwithstanding their substantial profits, however, none of Mario's clan filed tax returns except Charles, who claimed a $1,900 loss from his automobile business. More alarming is that Connie Walker and Charles and Antoinette Lloyd collected public aid at different times during the course of the conspiracy, while simultaneously buying or receiving as gifts expensive jewelry, furs, and cars.

Unfortunately for Mario and his coterie, their party ended on July 11, 1989 when a Special Grand Jury indicted all appellants. Their original indictment was later superseded on August 15, 1989 by a 30–count indictment. After a lengthy trial, the jury convicted all defendants on all counts.

On appeal these five defendants, Mario, Charles, Antoinette, Walker, and Jackson, raise a slew of arguments.[1] We have read each of their briefs thoroughly and reach only those issues that have arguable merit and demand our serious consideration. Although numerous, we are not persuaded by any of defendants' arguments on appeal and therefore affirm.

## II.

■ Mario Lloyd,[2] joined by his brother Charles Lloyd,[3] first argues that the district court erred in accepting the magistrate judge's recommendation to deny their request for a *Franks* hearing. *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978). The Fourth Amendment requires the district court to hold an evidentiary hearing where a defendant makes a "substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit [and] the allegedly false statement is necessary to the finding of probable cause." *Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676.

■ Mario and Charles alleged that a search warrant used to recover approximately $1.25 million in cash from various safe deposit boxes contained false statements by a confidential informant known as Eva Ward (a past girlfriend of Mario's). Without her statements, they urge, the magistrate would not have issued the warrant. We review a district court's decision not to hold a *Franks* hearing for clear error, *United States v. Pace*, 898 F.2d 1218, 1226–27 (7th Cir.), *cert. denied*, 497 U.S. 1030, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990), and we presume that an affidavit supporting a search warrant is valid. *Franks,* 438 U.S. at 171, 98 S.Ct. at 2684; *United States v. Radtke*, 799 F.2d 298, 309 (7th Cir.1986).

■ As their sole basis for a *Franks* hearing, the defendants furnished only a tape recording of a private investigator's subsequent interview with Eva Ward and the investigator's affidavit as to the authenticity of the tape recording. Ward's recantation of her earlier statements was not corroborated in any way. Without sworn testimony or

1. A sixth defendant, Andrew Jefferson, was also convicted but died prior to sentencing.

2. Mario, the kingpin of the drug ring, was indicted on one count of conspiracy to distribute cocaine, 21 U.S.C. § 846, six counts of distributing cocaine, 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2, one count of engaging in a continuing criminal enterprise, 21 U.S.C. § 848, one count of conspiracy to defraud the United States, 18 U.S.C. § 371, two counts of conducting monetary transactions with drug money, 18 U.S.C. § 1957(a), two counts of money laundering, 18 U.S.C. §§ 1956(a)(1)(B)(i) & (ii), and two counts of structuring monetary transactions to avoid currency reporting requirements, 31 U.S.C. §§ 5322(a), 5324(3). After a six-week trial, the jury convicted Mario on all counts. The district judge sentenced him to life imprisonment and imposed a $26,000,000 fine.

In addition to his brief filed by counsel, Mario Lloyd also filed a *pro se* brief on behalf of himself and all other defendants.

3. Charles Lloyd was charged with one count of conspiracy to distribute cocaine, 21 U.S.C. § 846, one count of distributing cocaine, 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2, one count of conducting monetary transactions with drug money, 18 U.S.C. § 1957(a), one count of money laundering, 18 U.S.C. §§ 1956(a)(1)(B)(i) & (ii), and one count of structuring monetary transactions to avoid currency reporting requirements, 31 U.S.C. §§ 5322(a), 5324(3). The jury convicted Charles on all counts. The district judge sentenced Charles to 270 months' imprisonment and imposed a $100,000 fine.

On his own, Charles also argues that the district court erred when it did not grant his motion for a severance when an automobile salesman, Ted Nicholas, misidentified Charles as the cash purchaser of a $19,000 automobile. However, at trial Charles never requested a hearing, waiving this argument on appeal. *See United States v. Beverly*, 913 F.2d 337, 353 n. 23 (7th Cir.1990). Moreover, we agree wholeheartedly with the district court that this was "not a core issue in this case," having nothing to do with Charles' guilt or innocence. The prejudicial impact of the salesman's testimony was insignificant in comparison to the remainder of the evidence against Charles. Therefore, the district court properly denied Charles' motion to sever.

other reliable evidence, Ward's taped conversation surely does not satisfy the defendant's burden of establishing the probable falsity of her statements in the warrant, especially in light of the government's detailed recitation of Ward's statements. *See, e.g., United States v. McNeese*, 901 F.2d 585, 594 (7th Cir.1990) ("a defendant seeking a *Franks* hearing bears a substantial burden to demonstrate probable falsity") (citing *United States v. Hornick*, 815 F.2d 1156, 1158 (7th Cir. 1987)). Even absent Ward's prior statements, sufficient evidence from a variety of other unimpeached sources included in the warrant justified probable cause, obviating the need for a *Franks* hearing. Therefore, the district court properly denied the defendants' request for a *Franks* hearing.

■ Both Mario and Charles next contend that the district court erred in denying their request for a mistrial. Specifically, they allege that defense lawyers raised mutually antagonistic defenses in their summations at trial, warranting a mistrial. We review a failure to grant a mistrial or severance for abuse of discretion. *Zafiro v. United States*, — U.S. —, —, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). Unless the defendants demonstrated that they " 'could not possibly have a fair trial without a severance,' " the district court will have properly denied their motion for a new trial. *United States v. Smith*, 995 F.2d 662, 670 (7th Cir. 1993) (quoting *United States v. Caliendo*, 910 F.2d 429, 437 (7th Cir.1990)), *cert. denied*, — U.S. —, 114 S.Ct. 718, 126 L.Ed.2d 683 (1994). Generally, co-conspirators indicted together should also be tried together. *Id.* at 670.

■ Mario and Charles argue that during summation the lawyers for two other co-defendants, Ronald Jackson[4] and Antoinette Lloyd,[5] developed mutually antagonistic de-

fenses to their own, necessitating a severance or mistrial. Essentially, Jackson's lawyer told the jury they could find a conspiracy but still find that his client was not involved. Antoinette's lawyer argued that the facts did not prove Antoinette's knowledge of the conspiracy and that the jury should not find her guilty simply because of her namesake. While there may be some tension between these statements and Mario's and Charles' defense that there was no conspiracy, they are nevertheless not antagonistic. *See United States v. Gironda*, 758 F.2d 1201, 1220 (7th Cir.), *cert. denied*, 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985); *see also United States v. Petullo*, 709 F.2d 1178, 1181–82 (7th Cir.1983). Moreover, the district judge sufficiently instructed the jury that although the defendants were being tried together, the jury should nevertheless consider the evidence with respect to each individual defendant separately. As in *Zafiro*, these instructions rendered any possible conflict harmless. *Zafiro*, — U.S. at —, 113 S.Ct. at 939. Therefore, the district court properly denied the defendants' request for severance or mistrial.

The defendants also raise several arguments concerning Judge Aspen's instructions to the jury. Upon review of the instructions, we find no error.

■ First, Antoinette argues that the district court erred by giving the "ostrich" instruction.[6] Essentially, the ostrich instruction states that a person cannot avoid the "knowingly" requirement of a crime by consciously avoiding the truth about a particular transaction and then claim their actions arose through ignorance, accident or mistake. *United States v. Bigelow*, 914 F.2d 966, 970 (7th Cir.1990) (citing *United States v. Ramsey*, 785 F.2d 184, 190–91 (7th Cir.1986)),

---

**4.** Ronald Jackson was charged with one count of conspiracy to distribute cocaine, 21 U.S.C. § 846, and one count of distributing cocaine, 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2. The jury convicted Jackson on both counts and the district judge sentenced Jackson to 260 months' imprisonment.

**5.** Antoinette Lloyd was charged with one count of conspiracy to defraud the United States, 18 U.S.C. § 371, five counts of money laundering,

18 U.S.C. §§ 1956(a)(1)(B)(i) & (ii), and five counts of structuring monetary transactions to avoid currency reporting requirements, 31 U.S.C. §§ 5322(a), 5324(3). The jury convicted Antoinette on all counts and the district judge sentenced her to 45 months' imprisonment.

**6.** Walker and Charles Lloyd join her on appeal, although only Antoinette objected to the instruction at trial.

*cert. denied,* 498 U.S. 1121, 111 S.Ct. 1077, 112 L.Ed.2d 1182 (1991). In this case, the defendants asserted they did not know that their scheme to buy money orders and cashier's checks in amounts less than $10,000, in an admitted effort to avoid currency reports associated with Mario and his mother's real estate purchase, was illegal.

An ostrich instruction is appropriate when a defendant " 'claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance.' " *Id.* at 970 (quoting *United States v. Talkington,* 875 F.2d 591, 596 (7th Cir.1989)). We review a judge's decision to give the ostrich instruction for an abuse of discretion, *Smith,* 995 F.2d at 674 (citing *United States v. Caliendo,* 910 F.2d 429, 433–34 (1989)), and review evidence and make inferences in a light most favorable to the government. *Talkington,* 875 F.2d at 596. In this case, the defendants claimed a lack of guilty knowledge, asserting their lawyer told them the transactions were permissible. Reading the facts in a light most favorable to the government, the district court could reasonably infer that the defendants had consciously avoided knowledge about the source of the money and the illegal nature of the structuring. Therefore, the trial judge properly gave the jury the ostrich instruction.

■■■■ The defendants additionally argue that the wording of the ostrich instruction was prejudicial. In his instruction, the trial judge told the jury: "No person can intentionally avoid knowledge with a conscious purpose to avoid learning the truth by closing his or her eyes to facts which should prompt him or her to investigate." Defendants cite *United States v. Ramsey,* 785 F.2d 184, 190–91 (7th Cir.), *cert. denied,* 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986), repeating our earlier criticism of this instruction. Evidently the defendants hope that unlike in *Ramsey,* we will now hold such an instruction reversible error. Unfortunately for the defendants, we will not. Although we stand by our earlier criticism of this instruction, we nevertheless reiterate our holding in *Ramsey* that this instruction is not reversible error even though better instructions are available and encouraged.

Charles alone takes issue with two more of the jury instructions. He contends that the district judge erred in not giving his requested jury instruction that "[t]he term specified unlawful criminal activity, as used in these instructions, means the specific violations of narcotic laws as set forth in the indictment" with respect to his charge for violating 18 U.S.C. § 1956. Section 1956 forbids involvement in a financial transaction "designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). In lieu of Charles' requested instruction the district court told the jury that they must find that "the funds used in the transaction represented the proceeds of specified unlawful criminal activity, that is, the receipt, concealment, buying, selling or otherwise dealing in cocaine."

■■■■ District courts have substantial discretion in wording specific instructions, *United States v. Penson,* 896 F.2d 1087, 1090 (7th Cir.1990), and where instructions as a whole treat a case fairly and accurately, we will not disturb them on appeal. *Smith,* 995 F.2d at 669–70. Moreover, "small differences in the wording of instructions will rarely have such impact on the jury as to warrant reversal." *United States v. Josefik,* 753 F.2d 585, 589 (7th Cir.), *cert. denied,* 471 U.S. 1055, 105 S.Ct. 2117, 85 L.Ed.2d 481 (1985). Charles argues that Judge Aspen's instruction provided the jury with a vague and incomplete definition of the statutory violation. We disagree. The instructions do not refer to any crime in general, they refer specifically to trafficking in cocaine, which is included in the definition of "specified unlawful activity" under 18 U.S.C. § 1956(b)(7). When read as a whole and in the context of this entire case, the instructions to the jury sufficiently specified the crimes underlying Charles' violation of 18 U.S.C. § 1956.

■■■■ Charles also argues that the district court erred by failing to give a "multiple conspiracy" instruction. *See United States v. Kendall,* 665 F.2d 126, 136 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). If the possibility of a

multiple conspiracy exists, then the district judge must so instruct the jury. *Id.* However, as we have previously noted, it is sometimes difficult to discern whether or not such a possibility exists. "If the persons join together to further one common design or purpose, a single conspiracy exists. Multiple conspiracies, by contrast, exist when there are separate agreements to effectuate distinct purposes." *Id.*

■ In this case the district court used our Circuit's pattern instruction 5.11 on conspiracy, 1 FEDERAL CRIMINAL JURY INSTRUCTIONS FOR THE SEVENTH CIRCUIT 5.11 (1980), and refused to give an additional instruction proposed by the defendants. A defendant is entitled to an instruction on his defense only if "the defendant proposes a correct statement of the law; the defendant's theory is supported by the evidence; the defendant's theory of defense is not part of the charge; and the failure to include an instruction on the defendant's theory of defense in the jury charge would deny the defendant a fair trial." *United States v. Douglas,* 818 F.2d 1317, 1320–21 (7th Cir.1987), *cert. denied,* 493 U.S. 841, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989). We need not concern ourselves with either of *Douglas'* first or second requirements, because Charles cannot meet either of *Douglas'* last two requirements. We have previously held that instructions similar to the ones given here sufficiently inform the jury that they can find the defendants guilty only of the conspiracy charged. *United States v. Auerbach,* 913 F.2d 407, 417 (7th Cir.1990). Moreover, the record supports the government's single conspiracy theory. Testimony from various government witnesses substantiates that Mario headed the conspiracy, assisted in various capacities by the other defendants. There is simply little to suggest the existence of two or more separate conspiracies, and it is not error to refuse a multiple conspiracy instruction where the evidence does not warrant such an instruction, as in this case. *United States v. Mazzanti,* 888 F.2d 1165, 1173 (7th Cir.1989), *cert. denied,* 495 U.S. 930, 110 S.Ct. 2167, 109 L.Ed.2d 497 (1990). Therefore, the district court's refusal to give the multiple conspiracy defense instruction did not result in an unfair trial and was not an abuse of discretion.

Finally, all defendants except Jackson take issue with the instructions to the jury on the charges of structuring financial transactions. 31 U.S.C. §§ 5322(a), 5324(3). Two days prior to oral argument in this case, the Supreme Court issued its opinion in *Ratzlaf v. United States,* — U.S. —, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). We granted the parties leave to analyze *Ratzlaf*'s implications in this case. The Court in *Ratzlaf* held that 31 U.S.C. § 5322(a)'s "willfulness" requirement requires the government to prove that a defendant knew that structuring financial transactions was illegal, not merely that the defendant intended to circumvent a bank's reporting requirement in 31 U.S.C. § 5313(a). Section 5313(a) and its corresponding regulation at 31 C.F.R. § 103.22(a) require a financial institution to report any cash transactions involving more than $10,000 to the Internal Revenue Service. Section 5324 makes it illegal for any person to "cause or attempt to cause a domestic financial institution to fail to file a report required under § 5313(a)" if done "for the purpose of evading the reporting requirements of § 5313(a)." The penalty for anyone who "willfully violate[s]" § 5324 is a maximum fine of $1,000 and one year in prison.

In *Ratzlaf,* the unlucky defendant owed a casino $160,000 for gambling losses. He first attempted to pay the casino in cash, but when the casino informed him of its reporting obligations, he took his cash to several area banks to get money orders, each in an amount less than $10,000. Based on this, the government charged Ratzlaf with violating §§ 5322(a) and 5324. The trial judge instructed the jury that the government needed to prove that Ratzlaf knew of the banks' reporting obligations and that he attempted to evade those reporting obligations. However, the judge instructed the jury explicitly that the government need not prove Ratzlaf knew his structuring was illegal.

Justice Ginsburg, writing for a five-Justice majority, concluded that while normally ignorance of the law is no defense to a criminal charge, in the case of 31 U.S.C. § 5322(a), Congress "decree[d] otherwise." *Id.* at —, 114 S.Ct. at 663. The majority reasoned that "currency structuring is not inevitably nefarious," and held that reasonable and consistent construction of the word "willfully" in

§ 5322(a) requires the government to prove that the defendant knew "of his duty not to avoid triggering such a report." *Id.* at ——————, 114 S.Ct. at 660–62. Therefore, the judge's instruction to the jury that they need not find that Ratzlaf knew the structuring was illegal was incorrect and Ratzlaf won a new trial.

■■■ Connie Walker,[7] Antoinette, Charles, and Mario argue in their supplemental brief that a new trial is warranted here as well. We disagree. The instructions to the jury complied with the requirements set forth in *Ratzlaf.* In his instructions to the jury, the judge stated:

> In order to sustain the charge of unlawfully structuring a transaction, the government must prove the following: First, that the defendant you are considering structured, assisted in structuring, or attempted to structure a currency transaction; Second, that the defendant you are considering structured, assisted in structuring or attempted to structure the transaction for the purpose of evading the currency reporting requirements; Third, that the transaction involved one or more domestic financial institutions; Fourth, *that the defendant you are considering acted wilfully.*
>
> If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty. If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

*An act is done wilfully if done voluntarily and with intention to do something the law forbids.*

(Emphasis supplied.) Unlike *Ratzlaf,* here there was no instruction that the jury need not find that the defendants knew about their duty to avoid structuring transactions. By contrast, Judge Aspen's instruction on the definition of "willfully" made clear to the jurors that the defendants *did* need to know their actions were illegal. Therefore, we find that the instructions do not merit a new trial under *Ratzlaf.*[8]

### III.

Mario, Jackson, and Walker each argue, albeit for different reasons, that the district court erred when it refused to hold a hearing before it denied their motions for a new trial based on the discovery of new evidence. Fed.R.Crim.P. 33. Under Rule 33, a district court may order a new trial "if required in the interest of justice." We review the district court's decision not to hold a hearing prior to ruling on the Rule 33 motion for an abuse of discretion. *United States v. Hedman,* 655 F.2d 813, 814 (7th Cir.1981).

■■■ In *Jarrett v. United States,* 822 F.2d 1438, 1445 (7th Cir.1987), we held that a defendant seeking a new trial based on the discovery of new evidence must show that the new evidence: 1) came to the defendant's knowledge only after trial; 2) could not have been discovered sooner through the exercise of due diligence; 3) is material and not merely impeaching or cumulative; and 4) would probably lead to an acquittal in the event of a new trial. *Jarrett,* 822 F.2d at 1445 (citing

---

7. Connie Walker was charged with one count of conspiracy to defraud the United States, 18 U.S.C. § 371, two counts of conducting monetary transactions with drug money, 18 U.S.C. § 1957(a), four counts of money laundering, 18 U.S.C. §§ 1956(a)(1)(B)(i) & (ii), and four counts of structuring monetary transactions to avoid currency reporting requirements, 31 U.S.C. §§ 5322(a), 5324(3). The jury convicted Walker on all counts and the district judge sentenced her to 63 months' imprisonment.

8. Related to our consideration of the issues in *Ratzlaf,* the defendants also argue that the evidence was insufficient to prove that they knew the money laundering transactions were designed to conceal the ownership of the funds or avoid reporting the transaction in a currency report. When a defendant challenges the sufficiency of the evidence, we draw all inferences most favorably to the government, and affirm the jury's verdict if any rational trier of fact could have found the defendant guilty. *United States v. Penson,* 896 F.2d 1087, 1093 (7th Cir.1990). After a thorough review of the record, and viewing the evidence in a light most favorable to the government, we find that a reasonable juror could find that the defendants knew the transactions were illegal and intended to hide the source of the income. The intricate and odd structuring of transactions used to pay for Mario's condominium, in addition to the mass of other evidence, provided ample evidence that the defendants knew their actions were illegal.

cases). Mario and Jackson, in their respective requests for a new trial, presented various items of "newly discovered" evidence they argued warranted a new trial. The only two items we believe merit our attention are evidence that governmental witness Troy Shelton recanted his testimony at trial, and allegations that the government altered safe deposit vault slips admitted into evidence.

Mario and Jackson first contend that government witness Troy Shelton's alleged "recantation" of his testimony after trial warranted a new trial. Troy Shelton, who at different times worked for Mario, Jackson, and Charles Lloyd, testified that he had distributed cocaine for or to each of these defendants in various quantities. After trial, while in a jail cell with Jackson, Shelton wrote a letter, exclaiming that "everything I testified to under oath about Ronald Jackson was a lie and the government made me say everything about Ronald Jackson so they could get a conviction." Based on this letter, Jackson moved for a new trial. Although the letter does not mention Mario, in his motion for new trial Mario nevertheless argued that Shelton also lied when he testified against him.

■■■■ To win a new trial based on recanted testimony, a defendant must demonstrate that the recantation is true, that the jury might have reached a different result were it not for the false testimony, and that the witness's testimony took the defendant by surprise. *Olson v. United States*, 989 F.2d 229, 231 (7th Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993). First, there is little support for the truth or trustworthiness of Shelton's alleged recantation, especially considering the circumstances under which it took place. Shelton recanted while in a jail cell with appellant Jackson—a situation the district court prop-

erly regarded as "highly suspicious." *See, e.g., United States v. Leibowitz*, 919 F.2d 482, 483 (7th Cir.1990) (affirming district court denial of new trial motion under similar circumstances), *cert. denied*, 499 U.S. 953, 111 S.Ct. 1428, 113 L.Ed.2d 480 (1991). Shelton's testimony at trial was also corroborated by several other witnesses, mitigating the significance of any possible recantation. Finally, it is unlikely Shelton's testimony took Mario or Jackson by surprise. Prior grand jury transcripts available to the defendants foreshadowed Shelton's testimony, and Mario, Jackson and other defendants cross-examined Shelton, giving them adequate opportunity to expose any allegedly false statements. Because Shelton's testimony did not take Mario by surprise and was corroborated by several other witnesses, and because the circumstances under which Shelton recanted lent scant credibility to his statements, the district judge properly denied both Mario's and Jackson's request for an evidentiary hearing.

■■■ Mario also alleged that the government altered numbers on the safe deposit vault slips corresponding to the safe deposit boxes in which the government seized the $1.25 million in cash. Given the mass of other evidence against Mario, we find it highly unlikely that a minor discrepancy about safe deposit box numbers would probably lead to an acquittal. Nevertheless, as the district court properly concluded, the evidence did show that the number "1722" on the slip had been scratched out and replaced with the number "1138", but there is no evidence the *government* made the alteration. Therefore, the district judge did not err in refusing to conduct an evidentiary hearing.[9]

---

9. Even if we believed the government made the alteration, Mario could have raised his objection at trial, failing *Jarrett*'s first and second requirements. The government allowed Mario and his attorney access to all the relevant exhibits prior to and at trial. Therefore, we too find Mario's claims regarding newly discovered evidence without merit. An evidentiary hearing on such a trivial item would have contributed nothing to Mario's defense.

In a related argument, Mario argues that the district court erred in refusing to subpoena certain documents relating to his request for a new

trial. Charles Lloyd makes a substantially similar argument in his *pro se* brief. Initially we note that the district court has broad discretion in deciding whether or not to subpoena documents, and we review the district court's determination for an abuse of that discretion. *United States v. Morrison*, 946 F.2d 484, 491 (7th Cir.1991) (citing *United States v. Garza*, 664 F.2d 135, 141 (7th Cir.1981)), *cert. denied*, — U.S. ——, 113 S.Ct. 826, 121 L.Ed.2d 696 (1992). In his motion for new trial, Mario requested that the district court subpoena certain items, including taped conversations between Drug Enforcement Agents and

Walker also argues that the district court should have held a hearing on their Rule 33 motion, but for a different reason.[10] She alleges the district court should have granted her a new trial based on her lawyer's conflict of interest and failure to vigorously cross-examine a key witness. Walker's primary defense to the money laundering and transaction structuring charges was that Daniel Mangiamele, a lawyer referred to Walker and her family by Sam Adam (Walker's counsel at trial), advised her that the transactions were permissible and legal. She also alleges that Sam Adam helped the Lloyd family structure their financial transactions to avoid government scrutiny. Adam's alleged ethical breaches, she argues, created such a conflict that he could not adequately present her defense because he feared exposing his own wrongdoing. Adam delegated the cross-examination of Mangiamele to his junior associate, Laurence Levin, whose cross-examination failed to sufficiently elicit from Mr. Mangiamele the facts, as Walker saw them, of Mr. Mangiamele's participation in the Lloyd family's money laundering operation. Adam did this, she argues, because he feared exposing his own wrongdoing vis-a-vis the Lloyd family finances. Walker contends that counsel without this conflict would have been able to elicit from Mr. Mangiamele the fact that he advised Walker that her transac-

tions were permissible. We disagree. Mr. Levin adequately cross-examined Mr. Mangiamele as did other defense attorneys. Mr. Levin asked Mr. Mangiamele on several occasions about his conversations with Walker regarding her use of cash or other instruments to purchase real estate.[11] Therefore, any exculpatory information Mr. Mangiamele would have provided was already before the jury. The district court acted properly within its discretion in denying the defendants' motion for a new trial without a hearing.

## IV.

Finally, Mario and Jackson urge us to vacate their respective sentences. Mario contends that the district judge erred when he stated that the jury's finding of the amount of cocaine was "binding" on him and when he failed to make specific findings concerning Mario's allegations of inconsistency in his presentence report. *See* Fed. R.Crim.P. 32(c)(3)(D). Specifically, Mario Lloyd asserts that the district judge did not allow him to present information in mitigation of his sentence, nor did the district judge make any inquiry into his assertions that a witness lied and later recanted his testimony. In our review of Mario's sentencing, we will not disturb the district court's factual findings unless we are " 'left with the definite

alleged informants and Troy Shelton's medical records. None of the evidence Mario requests is "new" evidence that would warrant a new trial. The items Mario requested were either already available to him and his counsel prior to trial had he desired to use them or could have been subpoenaed before trial by Mario or Charles. Moreover, even if the district court did subpoena the items Mario seeks, they would not have affected the trial's ultimate outcome. Mario's attorney and other defense attorneys extensively cross-examined Shelton, and both the government and defense revealed Shelton's drug problem. Further testimony regarding any mental problems Shelton might have had would not have done much more to harm his credibility. Moreover, had Mario desired, he could have compelled the testimony of the witnesses on the tapes he now seeks. Therefore, the district judge was well within his discretion when he refused to subpoena any of the additional evidence. *See, e.g., United States v. Butler*, 885 F.2d 195, 200 (4th Cir.1989) (holding that the district court did not abuse its discretion in denying a Rule 17 motion to subpoena evidence where the defen-

dant had made no effort to procure the testimony prior to trial).

10. We have significant doubts about whether Walker properly preserved this issue for appeal. Walker joined Mario's motion for a new trial, which contained an affidavit that set forth the facts above. This affidavit, without more, she argues, should have put the court on notice of a conflict and signalled to the district judge the need for a hearing on the matter. However, Walker did not argue this before the district judge, making it almost impossible for us to review. No matter, because even if we did not dismiss this argument as inappropriate for review because Walker did not raise the issue of her lawyer's conflict at trial, *United States v. Beverly*, 913 F.2d 337, 353 n. 23 (7th Cir.1990), *cert. denied*, 498 U.S. 1052, 111 S.Ct. 766, 112 L.Ed.2d 786 (1991), this purported conflict nevertheless would not have changed the outcome at trial.

11. In fact, Mr. Mangiamele testified that he told Walker that he only wanted *one* check for the down payment on the townhouse.

and firm conviction that a mistake has been made.'" *United States v. Rivera,* 6 F.3d 431, 444 (7th Cir.1993) (quoting *United States v. Nunez,* 958 F.2d 196, 198 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 168, 121 L.Ed.2d 115 (1992)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1098, 127 L.Ed.2d 411 (1994); *United States v. Duarte,* 950 F.2d 1255, 1262 (7th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992). After our review of the record, we are convinced the district judge made no legal or factual mistake in sentencing Mario Lloyd.

Pursuant to 21 U.S.C. § 848(b),[12] the district court sentenced Mario to life imprisonment. In sentencing Mario, the district judge stated:

My findings are, first that the jury's finding as to amounts is a binding one, and under Section 848(b) a mandatory life sentence is appropriate. In the alternative, it is my finding that based upon the evidence presented in this courtroom, that the amounts are sufficient to qualify for an 848(b) sentencing.

It is my further finding that even if the amounts were not appropriate, that I would depart from the lesser sentence and sentence Mr. Lloyd to a mandatory life sentence.

... The departure [to a life sentence] is also justified by Mr. Lloyd's unprecedented recruiting of other individuals into his criminal enterprise, including the corrupting of his own family—Mr. Lloyd is the cause of his mother, sister, brother facing penitentiary sentences. In that sense, this case is a truly unique one which would warrant the departure.

■■■ Mario argues that the district judge mistakenly stated he was "bound" by the jury's determination as to the amount of cocaine involved. During sentencing, a district judge may consider evidence from the trial in determining drug quantities, but he must nevertheless make his own independent determination.[13] The government here submits that the judge was merely crediting the jury's verdict when he stated he was "bound," and that he must not have meant "bound" in its usual sense. Although in other circumstances we might delve more deeply into the possible meaning of the trial judge's statement, in this case it is unnecessary because the judge alternatively stated that he found sufficient facts to support Lloyd's involvement with more than 150 kilograms, and he found sufficient aggravating circumstances to support an upward departure to a life sentence in any event. Even if we presumed there was a misstatement, it was clearly harmless.

Mario also questions the district court's obedience to Federal Rules of Criminal Procedure 32(a)(1)(C) and 32(c)(3)(D). Rule 32(a)(1)(C) states that before sentencing a district judge must "address the defendant personally and determine if the defendant wishes to make a statement and to present any information in mitigation of the sentence." In Mario's sentencing hearing, the district judge followed Rule 32(a)(1)(C) and allowed Mario to make a statement prior to sentencing. As appropriately summarized by the district judge, Mario's rambling commentary could be fairly categorized as a claim he did not receive a fair trial, that the evidence was insufficient to find him guilty of

---

**12.** 21 U.S.C. § 848(b) states, in relevant part:

(b) Any person who engages in a continuing criminal enterprise shall be imprisoned for life and fined in accordance with subsection (a) of this section, if—

(1) such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and

(2)(A) the violation referred to in subsection [(c)(1)] of this section involved at least 300 times the quantity of a substance described in section 841(b)(1)(B) of this title ...

*See generally United States v. Kramer,* 955 F.2d 479, 484–85 & n. 4 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992) (suggesting that § 848(b) appears to be a sentencing enhancement provision rather than a substantive offense).

**13.** *See, e.g., United States v. Levy,* 955 F.2d 1098, 1106 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 102, 121 L.Ed.2d 62 (1992). Although there is some question as to the binding nature of the jury's determination in the context of a life sentence pursuant to § 848, we need not address that issue here. In this case, the jury was not specifically requested to make a finding regarding the amount of drugs involved in Mario's violation of § 848, although in the indictment, Count Eight, which concerns § 848, references and incorporates Count One, which charges the defendants with conspiracy to distribute over fifteen hundred kilograms.

the charges, and that the evidence did not adequately support a determination that the conspiracy involved more than 150 kilograms of cocaine. Although many of Mario's statements were not relevant to his sentence, *per se*, and could have been dismissed on that basis, the district judge nevertheless elected not to side with Mario on each of these three contentions. The trial judge found Mario did receive a fair trial, that there was sufficient evidence to convict Mario, and that there was ample evidence to support the finding that the conspiracy involved over 150 kilograms. *See, e.g., United States v. Baker,* 1 F.3d 596, 598–99 (7th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 412, 126 L.Ed.2d 359 (1993). Therefore, the district court did not violate Rule 32(a)(1)(C).

■ Rule 32(c)(3)(D) states that if the defendant's or defense counsel's comments allege any factual inaccuracy in a defendant's presentence investigation report, the district judge shall make a "finding as to the allegation." As best we can tell, Mario alleged generally that the government witnesses were not sufficiently credible to support a determination of over 150 kilograms of cocaine. Contrary to Mario's assertions, as indicated in our discussion above the district judge did make an explicit finding as to the amount of drugs involved. In the very section Mario cites to criticize the use of the word "bound," the judge continues and says he finds sufficient evidence to support a § 848(b) life sentence based on the amount of drugs involved. Mario also argues that the district judge did not adequately consider his allegations that government witnesses Troy Shelton and Ricky Shields perjured themselves. Although it is not entirely clear whether either of these challenges was properly before the district court, any failure to consider specific challenges to the credibility of either Shelton or Shields worked no real harm on Mario. Reading the evidence in a light most favorable to the government, the testimony from other witnesses was more than sufficient to support the determination that Mario's conspiracy distributed far in excess of 150 kilograms of cocaine. *See, e.g., Rivera,* 6 F.3d at 445–46. Therefore, the trial judge properly complied with Rule 32(c)(3)(D), and we find no error in Mario's sentencing.

■ For his part, Jackson argues that the district judge erred in calculating the amount of cocaine in the conspiracy which he could have reasonably foreseen. Specifically, Jackson argues that he was responsible for only 8 to 15 kilograms of cocaine, not 50 as the district court concluded. In sentencing a defendant involved in a drug conspiracy, the district judge should consider "not only the amounts involved in the transactions that were known to the defendant but also those that were reasonably foreseeable." *United States v. Savage,* 891 F.2d 145, 151 (7th Cir.1989). We uphold a sentencing judge's determination of fact unless clearly erroneous, including a finding as to the amount of drugs involved in an offense. *United States v. Mojica,* 984 F.2d 1426, 1443 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). We find there was sufficient evidence to find that Jackson was involved in trafficking over 50 kilograms of cocaine. Jackson worked with Mario for over seven months, during which time he either participated in or was aware of transactions almost every other day involving either one or two kilograms. Therefore, the district court's determination of the amount of drugs involved was not clearly erroneous.

AFFIRMED.

FLAUM, Circuit Judge, concurring.

I join the court's opinion affirming the district court. I write separately only to express some concern as to what I perceive as a possible ambiguity in the district court's instruction explaining *wilfulness* to the jury.

The United States Code provides that no person shall structure a financial transaction for the purpose of evading the legal reporting requirements. *See* 31 U.S.C. § 5324. Criminal liability attaches when one *"willfully"* violates § 5324. *See* 31 U.S.C. § 5322. Arguably, the district court's instruction ("An act is done wilfully if done voluntarily and with intention to do something the law forbids") is ambiguous in that the term *"willfully"* could be understood as either accepting the general intent to do something that happens to be illegal, or requiring the specific intent to engage in conduct that the defendant knows to be unlawful. The Supreme Court held recently that a criminal defendant charged with structuring does not act *willful-*

*ly* unless there is "specific knowledge by the defendant that his conduct is unlawful." *Ratzlaf,* —— U.S. at ——, 114 U.S. at 660 (citation omitted). I accept that when read in context, the *wilfulness* instruction given here, *see post* at 548, at least implicitly directs jurors to consider whether the defendant knew he was violating the law, and thus it meets the spirit of *Ratzlaf*—"[t]o convict [the defendant] of the crime with which he was charged, violation of 31 U.S.C. § 5322(a) and 5324(3), the jury had to find he knew the structuring in which he engaged was unlawful." *Ratzlaf,* —— U.S. at ——, 114 S.Ct. at 663. *See also Cheek v. United States,* 498 U.S. 192, 201, 111 S.Ct. 604, 610, 112 L.Ed.2d 617 (1991), quoted by *Ratzlaf,* —— U.S. at ——, 114 S.Ct. at 659 (noting that wilful "requires proof of 'voluntary, intentional violation of a known legal duty;'" *United States v. Warren,* 612 F.2d 887, 890 (5th Cir.1980) as quoted in *Ratzlaf,* —— U.S. at ——, 114 S.Ct. at 660 ("Wilful violation of § 5316's reporting requirement for transportation of currency across international boundaries requires that defendant 'have *actually known* of the currency reporting requirement and have voluntarily intentionally violated that known legal duty.'").

In assessing jury instructions, "consideration must be given to the charge as a whole," and "there is no error even though an isolated clause may be inaccurate, ambiguous, incomplete or otherwise subject to criticism." *Binks Mfg. Co. v. Nat'l Presto Industries, Inc.,* 709 F.2d 1109, 1117 (7th Cir. 1983). "An erroneous instruction is not otherwise reversible unless the court is 'left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.'" *Id.* (citation omitted). Though the district court may not have employed the best phraseology when judged by the hindsight of *Ratzlaf,* my reservation concerning any possible ambiguity falls marginally short of the threshold error required by *Binks.* Thus, even though the structuring instruction given here avoids reversal by our court, I suggest that future instructions should incorporate the words "know" or "knowing" when explaining to a jury the mental state required for a § 5322 violation. *See Ratzlaf,* —— U.S. at ——, 114 U.S. at 660.

· *ORDER*

July 29, 1994

On consideration of the petition for rehearing and the motion to amend the opinion filed in the above-entitled cause by petitioner, Ronald Jackson, all of the judges on the panel have voted to deny the petition for rehearing and the motion to amend the opinion.

We agree that Jackson's affidavit is susceptible to many interpretations, but Jackson's counsel confirmed during oral argument that Jackson was in the same cell with Shelton. In any event, even if we chose to believe Jackson's interpretation in disregard of his counsel's statements during oral argument, the fact that Jackson was not in the same cell, but merely in the same prison, does not affect our disposition. *See United States v. Liebowitz,* 919 F.2d 482, 483 (7th Cir.1990).

IT IS THEREFORE ORDERED that the aforesaid petition for rehearing and motion to amend the opinion are hereby DENIED.