**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ramon J. VAZQUEZ, Defendant–
Appellant.**

**No. 93–4816.**

United States Court of Appeals,
Eleventh Circuit.

June 7, 1995.

---

Mark King Leban, Miami, FL, for appellant.

Kendall B. Coffey, U.S. Atty., Steven A. Tyrrell, Carol Herman, Linda Collins Hertz, Asst. U.S. Attys., Miami, FL, for appellee.

Before KRAVITCH and CARNES, Circuit Judges, and HILL, Senior Circuit Judge.

CARNES, Circuit Judge:

In May of 1993, a federal district court jury convicted Ramon J. Vazquez of forty-one counts of structuring financial transactions and one count of conspiracy to structure financial transactions. Relying primarily on *Ratzlaf v. United States,* —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), issued by the Supreme Court after Vazquez had filed an appeal with this Court, Vazquez challenges his conviction on two grounds, asserting that the district court committed plain error in instructing the jury, and that there was insufficient evidence to support his conviction. He challenges his sentence on two grounds, as well, contending that the district court judge improperly enhanced his sentence under the "criminally derived property" adjustment, and that this Court should remand for resentencing according to a post-sentencing amendment to the applicable Sentencing Guideline. We reject Vazquez's attacks on his conviction and his contention concerning application of the "criminally derived property" adjustment to his sentencing calculus. However, we remand so that the district court may determine whether to resentence Vazquez under the amended Guideline.

## I. BACKGROUND

### A. THE STATUTORY REQUIREMENTS

The Currency and Foreign Transactions Reporting Act and its accompanying regulations require banks and other financial institutions to file a report with the government for any cash transactions involving more than $10,000. 31 U.S.C.A. § 5313(a) (West 1983); 31 C.F.R. § 103.22(a)(1) (1994). A financial institution also must file this report, known as a Currency Transaction Report ("CTR"), if it knows that a person is making multiple transactions in a single day that result in either deposits or withdrawals totalling over $10,000. 31 C.F.R. § 103.22(a)(1). It is illegal under § 5324 to cause or attempt to cause a financial institution to fail to file a report or to structure cash transactions "for the purpose of evading" the filing of a CTR. 31 U.S.C. § 5324(1) & (3).[1] According to the regulations, a person structures a transaction when he "conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements ...." 31 C.F.R. § 103.11(p). Section 5322 provides criminal penalties for any person "willfully violating" these provisions. 31 U.S.C.A. § 5322 (West Supp.1994).[2] This anti-structuring law "aims to prevent people from either causing a bank to fail to file a required report or defeating the government's efforts to identify large cash transactions by splitting up a cash hoard in a manner that avoids triggering a bank's reporting requirements." *United States v. Paul,* 23 F.3d 365, 367–68 (11th Cir.1994).

Vazquez was convicted of forty-one counts of causing or attempting to cause a bank to fail to file CTRs in violation of 31 U.S.C. §§ 5313(a), 5324(1), 5322(b); 31 C.F.R. §§ 103.11, 103.22 (1994); and 18 U.S.C. § 2. In addition, Vazquez and his wife, Suzanna Lynn Vermeul, were convicted of one count of conspiracy to structure financial transactions in violation of 31 U.S.C. § 5324(1) and (3); and 18 U.S.C. § 371. The district court sentenced Vazquez to concurrent terms of forty-eight months imprisonment followed by three years of supervised release. Although Vermeul also was convicted for eighteen counts of structuring, the district court entered a judgment of acquittal notwithstanding the verdict as to all but one of those

---

1. After Vazquez's indictment, § 5324(1)–(3) was reorganized as § 5324(a)(1)–(3) without substantive change. We will refer to the codification as it existed at the time of indictment.

2. After the Supreme Court's *Ratzlaf* decision, Congress amended § 5324 by giving it its own criminal penalty provision so that reliance on § 5322 is no longer necessary. This new provision does not include a separate requirement that the defendant act "willfully." *See* Riegle Community Development and Regulatory Improvement Act of 1994, Pub. L. No. 103–325, § 411, 108 Stat. 2160, 2253. Thus, the only mental state apparently required under the new penalty provision is a purpose to evade the filing requirement. *See United States v. Zehrbach,* 47 F.3d 1252, 1262 n.7, (3rd Cir.1995). That change is not applicable to this case, which arose before the new provision was enacted.

counts. She has not appealed her conviction or sentence.

## B. THE EVIDENCE

At trial, the government presented evidence that Vazquez, a carpenter in Miami, and Vermeul opened three bank accounts between 1986 and 1988 at Ponce de Leon Federal Savings and Loan ("Ponce de Leon Federal") in Coral Gables, Florida: a personal checking account, a business checking account, and a personal savings account.[3] Evelyn Bermejo, a branch manager at Ponce de Leon Federal, testified that beginning in 1991, there were large deposits and overdrafts in those accounts. Bermejo testified that forty-eight deposits over $10,000 were made into these accounts, and that she informed Vazquez that the bank was required to file a report when he made large cash transactions. Bermejo stated that she told Vazquez that the bank also filed a CTR if the sum of multiple deposits in the course of a single day exceeded $10,000. Ponce de Leon Federal eventually asked Vazquez to close out his accounts because of the substantial amount of overdrafts and because his large deposits often made the branch exceed the maximum cash level mandated by its insurance company. In August 1991, Vermeul opened a checking account at Barnett Bank in Miami Beach, Florida, and Vazquez did the same in January 1992. Barnett Bank has a computerized system that allows it to aggregate all the cash deposits made to an account during a single day in order to determine whether a CTR should be filed. Between December 1991 and April 1992, Vazquez and Vermeul made almost 200 deposits totalling $1,480,788 into these two accounts at four different branches of Barnett Bank. Vazquez made multiple deposits almost every business day, sometimes at different Barnett branches and sometimes at the same branch with the same teller on occasions separated by as little as two to three minutes. Each individual deposit was less than the $10,000 threshold amount, although the total for each day exceeded that amount. For example, on March 5, 1992, six different deposits were made into Vazquez's

account at four separate branches. The last three deposits were made at the same branch with the same teller and spaced approximately two to four minutes apart. The individual deposits ranged from $8,700 to $9,800 and the total deposited in the account for that day was $60,000.

There was evidence of other suspicious behavior by Vazquez. On one occasion, he asked a teller if he could make one deposit before two o'clock and another after two o'clock. After this request, Vazquez made a deposit and reentered the customer line. On another day, while Vazquez was purchasing a cashier's check and depositing $9,000 in his account, another unidentified man deposited $7,000 in Vazquez's account at virtually the same time. When the teller told the other man that his deposit was $100 less than the amount on his deposit slip, Vazquez gave the man money from his pocket to complete the transaction. During another visit to the bank, Vazquez told a teller that he would have liked to deposit more than $10,000, but that he did not want a CTR to be filed.

In addition, Vazquez gave inconsistent explanations of where he was obtaining the money that he was depositing. He told one teller that he had a construction company and that he cashed his customers' checks at another bank before making a deposit at Barnett. He informed another teller that he got his money from renting apartments in a building he owned near the beach, and he mentioned to a third bank employee that the money he deposited into the Vermeul account was money he was required to give to his ex-wife. Finally, his post-arrest statement to the police described the check-kiting scheme explained below.

The defense did not attempt to contest the government's evidence of Vazquez's numerous banking transactions; instead, it offered an alternative theory to explain his peculiar banking practices. Vazquez took the stand and testified that he began encountering financial difficulties at the end of 1990 after opening up his own carpentry shop. He stated that there often were delays in receiving payments from his contractors and that

3. Vazquez was not indicted for any transactions involving the Ponce de Leon Federal accounts.

those delays had led to large overdrafts in his bank account at Ponce de Leon Federal. As a solution to his financial straits, Vazquez decided to "do this type of cashing checks." To cover his overdrafts, he would cash a check at a supermarket, often under a fictitious name, for an amount equal to the overdraft plus the check cashing charge. He then would deposit the cash at the bank. Since he actually had very little money, Vazquez had to continually cash checks and make deposits to cover the previously cashed checks. Vazquez began this check-kiting scheme at Ponce de Leon Federal in mid- to late 1991, but then opened up an account at Barnett Bank after Ponce de Leon Federal refused to accept such large deposits anymore.

Vazquez acknowledged that his check kiting was wrong, but denied that he structured his deposits to avoid the filing of CTRs. He testified that the branch manager at Ponce de Leon Federal had told him that the bank filed reports whenever he made a deposit of $10,000 at one time or at different times within a single day. Vazquez was aware of this when he opened his Barnett account; thus, he stated that his multiple deposits in a single day were not intended to avoid the filing of a CTR, because he knew that the bank would aggregate his deposits, anyway. Vazquez explained that the reason many of his deposits were between $9,000 and $10,000 was that the supermarkets where he was cashing checks often did not have enough money to cash all of his checks at the same time. As a result, he would get whatever cash the store had, deposit it, and then return later when the store had more cash available. Vazquez also stated that many of the deposits were separated by only a few minutes because, as he was making his trips to the various grocery stores, he would fill out the deposit slip while he was at the store. Then, he would give the bank teller the separate deposits from each of the grocery stores or give the deposits to two tellers if they were both without customers.

Vazquez testified that the reason he had lied to the various bank tellers about the source of his money is that he could not tell them about his practice of cashing the checks at grocery stores. Vazquez stated that the unidentified man who had deposited $7,000 in Vazquez's account was his employee. Vazquez suggested that the employee was merely depositing money for Vazquez while Vazquez bought a cashier's check in another line that would not accept deposits; however, on cross examination, Vazquez admitted that he also made his own deposit at the same time. Finally, to demonstrate Vazquez's indifference to the bank's reporting requirements, the defense introduced evidence of sixteen single deposits over the amount of $10,000 that Vazquez had made at Barnett Bank in March of 1992.

## C. *RATZLAF V. UNITED STATES*

Under our previous case law, in order to convict a defendant for "willfully" violating the prohibition against money structuring, the government had to prove that the defendant was aware of the bank's reporting requirements and that he sought to evade these requirements by structuring his transactions. *United States v. Brown*, 954 F.2d 1563, 1568 (11th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 284, 121 L.Ed.2d 210 (1992). Significantly, the defendant's knowledge that structuring was illegal was not an element of the crime. *Id.* This was the law of this circuit at the time of Vazquez's trial.

In January 1994, after Vazquez had been convicted, the Supreme Court issued *Ratzlaf v. United States*, —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994).[4] In *Ratzlaf*, the Court held that the willfulness requirement in the criminal enforcement provision, 31 U.S.C. § 5322, requires the government to prove that "the defendant acted with knowledge that his conduct was unlawful." *Ratzlaf* at ——, 114 S.Ct. at 657. The defendant in that case admitted that he structured his cash transactions in order to circumvent the banks' legal duty to file CTRs; he contended, however, that the willfulness language in

**4.** Vazquez receives the benefit of the new rule announced in *Ratzlaf* because his case was still on direct appeal when the Supreme Court issued its opinion. *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987).

§ 5322 required the government to prove that he knew that structuring was unlawful. *Id.* at ——, ——, 114 S.Ct. at 657, 659. The Supreme Court agreed and so held. *Id.* at ——, 114 S.Ct. at 663.[5]

## II. DISCUSSION

Vazquez raises four issues in this appeal. First, he contends that the district court committed plain error by not instructing the jury that the government was required to prove that Vazquez acted with the knowledge that structuring was illegal. Second, he argues that the government presented insufficient evidence that Vazquez knew structuring was against the law. Third, he contends that the district court improperly enhanced his base offense level on the grounds that he knew or believed that the funds involved were criminally derived. Finally, he asks this Court to remand this case to the district court for resentencing under an amended version of the applicable Sentencing Guideline that was not in effect when he was sentenced.

### A. THE JURY INSTRUCTIONS

■ Vazquez contends that the district court committed reversible error by failing to instruct the jury that in order to convict Vazquez, the government had to prove that Vazquez knew his conduct was unlawful. The district court instructed the jury that Vazquez could be found guilty for the substantive structuring offenses only if the government proved the following facts beyond a reasonable doubt: (1) that Vazquez had knowledge of the reporting requirements; (2) that Vazquez "knowingly and willfully" caused or attempted to cause the bank to fail to file a CTR; (3) that Vazquez did so for the purpose of evading the reporting requirements; and (4) that Vazquez's acts were part of a pattern of activity involving more than $100,000 during a twelve-month period. The district court's instruction for the conspiracy

charge also included an instruction that the jury must find that Vazquez "willfully became a member of such conspiracy." The district court defined the term "willfully" as follows:

> The word "willfully" as that term has been used from time to time in these instructions means that the act was committed voluntarily and purposely *with the specific intent to do something the law forbids, that is, with bad purpose either to disobey or disregard the law.*

(emphasis added) In addition, the district court instructed the jury regarding the substantive structuring counts that:

> An attempt, ladies and gentlemen, as has been charged in [the substantive structuring counts] of the indictment consist[s] of an act which is done *with the specific intent to commit a particular crime* and is reasonably adapted to the accomplishment of that end.

(emphasis added)

■ Vazquez did not request a jury instruction informing the jury that the government was required to prove that he knew structuring was unlawful, nor did he object to the instructions. Accordingly, we review the jury instructions under the plain error standard. Fed.R.Crim.P. 52(b); *see United States v. Miller,* 22 F.3d 1075, 1079 (11th Cir.1994). The Supreme Court has established a three-step process for analyzing plain error: (1) there must be error; (2) the error must be plain; and (3) the error must affect substantial rights. *United States v. Olano,* —— U.S. ——, ——, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993); *see also United States v. Chandler,* 996 F.2d 1073, 1086 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2724, 129 L.Ed.2d 848 (1994). If these three prongs are met, we then have the discretion to correct the error, and we should do so if that error " 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Olano,* —— U.S. at

---

5. The fact that the defendant in *Ratzlaf* was convicted under § 5322(a) and Vazquez was convicted under § 5322(b) is of no consequence, because both provisions include the willfulness requirement. The latter provision simply provides a harsher penalty for a person who violates the

Act "while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12–month period ...." 31 U.S.C.A. § 5322(b) (West Supp.1994).

——, ——, 113 S.Ct. at 1776, 1779 (citation omitted); *Chandler,* 996 F.2d at 1086.

We need not discuss the entire test, because we find that any error in the jury instructions was not "plain," i.e., "clear" or "obvious." *Olano,* —— U.S. at ——, 113 S.Ct. at 1777.[6] The district court's instructions for both the substantive structuring counts and the conspiracy count included an instruction to the jury that it must find that Vazquez acted "willfully," and it defined that term. Under the definition given, in order to convict Vazquez for structuring or for conspiracy to structure, the jury was required to find the defendant structured his transactions with "the specific intent to do something the law forbids, that is, with bad purpose either to disobey or disregard the law." This complies with the requirement in *Ratzlaf* that the government must prove the defendant "knew the structuring in which he engaged was unlawful." *Ratzlaf,* —— U.S. at ——, 114 S.Ct. at 663. Based on the district court's definition of willfulness, we hold that the jury's charge did not constitute plain, clear or obvious error under *Ratzlaf.*

Vazquez's arguments to the contrary are not persuasive. He first contends that such a result is inconsistent with other decisions of this Court, such as *United States v. Granda,* 565 F.2d 922 (5th Cir.1978), which reversed a conviction because a district court failed to give an instruction on a mens rea element. We disagree. In *Granda,* the defendant was convicted for failing to file a report as required by federal law when she brought more than $5,000 into the United States. *Id.*

at 923. Because the statutes in question required a "knowing" and "willful" violation of the reporting requirement, we held that it was plain error not to instruct the jury that the government was required to prove she knew her conduct was illegal. *Id.* at 923–26. However, there is no indication in *Granda* that the jury instruction had defined "willfully" as acting with the knowledge that one's conduct is illegal. In contrast, the district court in our case specifically instructed the jury that "willfully" meant "the specific intent to do something the law forbids, that is, with bad purpose either to disobey or disregard the law." Thus, this case is distinguishable from *Granda.*

Vazquez also relies on *United States v. Morris,* 20 F.3d 1111 (11th Cir.1994), a decision involving convictions for willfully filing and subscribing false income tax returns. *Id.* at 1113–14. In that case, we held that a jury charge that included a definition of "willfully" almost identical to the one at Vazquez's trial "failed to adequately convey the properly asserted good-faith defense on which the [defendants] relied." *Id.* at 1117. However, because the defendants in *Morris* proffered a jury instruction at trial, the district court's refusal to include that instruction was reviewed under the abuse of discretion standard instead of the plain error test applicable here. *Id.* at 1114. That distinction is critical.[7] We do not consider how the jury instruction in our case would stand up under the more lenient abuse of discretion standard if Vazquez had objected at trial; we merely hold that it does not constitute plain error.[8]

---

6. In *Olano,* the Supreme Court specifically stated that it "need not consider the special case where the error was unclear at the time of trial but becomes clear on appeal because the applicable law has been clarified." —— U.S. at ——, 113 S.Ct. at 1777; *see United States v. Marder,* 48 F.3d 564 (1st Cir.1995) (noting that issue has engendered split among circuits and collecting cases). We do not address this issue either, because we find that any error was not "plain," even under the new rule announced in *Ratzlaf.*

7. "The plain error rule is not a run-of-the-mill remedy. The intention of the rule is to serve the ends of justice; therefore it is invoked 'only in exceptional circumstances [where necessary] to avoid a miscarriage of justice.'" *United States v. Gerald,* 624 F.2d 1291, 1299 (5th Cir.1980) (cita-

tions omitted), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981) (cited in *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)).

8. An additional difference between our case and *Morris* is that the omitted instruction in *Morris* was on the defendants' theory of defense at trial: that the defendants' erroneous tax returns were not filed willfully, but were filed in the good faith belief that the returns were legal. 20 F.3d at 1114–15. We concluded that the jury instructions given by the district court—which included a definition of willfulness, but not the good faith instruction requested by the defendants—denied the defendants "the opportunity for the jury to properly consider their only defense to the crime." *Id.* at 1118. In contrast, Vazquez's

Vazquez also points to post-*Ratzlaf* decisions of other circuits that have found plain error in jury instructions that did not adequately inform the jury that a defendant could be convicted only if he knew structuring was illegal. Most of those decisions, however, are missing what is present in our case: an instruction that expressly defines the willfulness element as an act done "with a bad purpose either to disobey or disregard the law." For example, the Third and Seventh Circuits found plain error in jury instructions that failed entirely to inform the jury that the government had to prove the defendant's knowledge that structuring was illegal. *See United States v. Retos*, 25 F.3d 1220, 1229–30 (3rd Cir.1994); *United States v. Jones*, 21 F.3d 165, 172 (7th Cir.1994). Other decisions finding plain error under *Ratzlaf* have involved instructions that affirmatively told the jury that willfulness did *not* require the defendant's knowledge of the illegality of his conduct. *See, e.g., United States v. Garza*, 42 F.3d 251, 253 (5th Cir.1994); *United States v. Jackson*, 33 F.3d 866, 869 (7th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1316, 131 L.Ed.2d 197 (1995); *United States v. Bencs*, 28 F.3d 555, 564 (6th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995); *United States v. Rogers*, 18 F.3d 265, 267 (4th Cir. 1994).

We find most analogous and persuasive the decision of the Seventh Circuit in *United States v. Walker*, 25 F.3d 540 (7th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 371, 130 L.Ed.2d 323 & — U.S. —, 115 S.Ct. 531, 130 L.Ed.2d 434 (1994), which involved a definition of the willfulness element that was substantially similar to the one in this case.

The jury instructions at issue in *Walker* informed the jurors that a structuring conviction required them to find that the defendants acted willfully and then defined willfully as an act "done voluntarily and with intention to do something the law forbids." *Id.* at 548. The Seventh Circuit held that this definition of willfully clearly informed the jurors that the defendants had to know that structuring was illegal in order to be convicted of structuring. *Id.; see also United States v. Goulding*, 26 F.3d 656, 669 (7th Cir.) (approving jury instruction that defined willfully as act done "with the purpose of *avoiding* a known legal duty"), *cert. denied*, — U.S. —, 115 S.Ct. 673, 130 L.Ed.2d 605 (1994). The district court's definition of willfully in Vazquez's trial was, if anything, more explicit than the one in *Walker* in telling the jury that before convicting Vazquez, the jurors had to determine that he knew he was acting illegally when he structured his deposits. Thus, the definition of willfulness given by the district court in this case, as in *Walker*, distinguishes it from those cases finding plain error in the absence of such an instruction or in the face of an instruction expressly stating that knowledge of illegality is not required.[9]

Finally, Vazquez contends that the district court's alleged error in the jury instructions was compounded by the prosecutor's remarks during closing arguments. The prosecutor, stating the law as it existed at that time, told the jury: "The government does not have to prove that either of the defendants knew that structuring was illegal." We observe initially that the counsel for Vermeul, Vazquez's co-defendant, argued to the jury that the opposite was true:

defense at trial was not that he was structuring deposits in the belief that it was legal to do so, but simply that he was not structuring his deposits.

9. *But see United States v. Marder*, 48 F.3d 564, 573 (1st Cir.1995); *United States v. Pitner*, 23 F.3d 1497 (9th Cir.1994). In *Marder*, the First Circuit found that a jury charge that defined willfully as acting "deliberately in violation of a known legal duty" was error because it did "not explicitly inform the jury that the defendant had to know that structuring itself was illegal." *Id.* at 572 n. 6. The *Marder* court, however, declined to reverse, because under the *Olano* analysis, the jury charge did not implicate the fairness, integrity, or public reputation of judicial pro-

ceedings given that the instructions were in accord with the law at the time of the trial. *Id.* at 574.

*Pitner*, 23 F.3d 1497, was decided after the Supreme Court vacated and remanded the Ninth Circuits' pre-*Ratzlaf* decision for consideration in light of *Ratzlaf*. *Pitner v. United States*, — U.S. —, 114 S.Ct. 873, 127 L.Ed.2d 70 (1994). The pre-*Ratzlaf* decision had affirmed a conviction in which the jury instructions defined willfully as done "knowingly and deliberately, either to disobey or to disregard the law." *United States v. Pitner*, 979 F.2d 156, 159 (9th Cir.1992). On remand, the Ninth Circuit, without analysis, reversed and remanded the case for a new trial in light of *Ratzlaf*. *Pitner*, 23 F.3d at 1497.

You have to find [co-defendant Vermeul] willfully, in other words, knowing that the law prohibited this activity, she did it anyway because she didn't care that it was illegal.... In this case, ignorance of the law is an excuse. And that runs contrary to most of our concepts, because ignorance of the law generally is not an excuse. But in a crime that requires a specific intent to violate a specific law, if you are unaware of the law, you can't have the specific intent to violate it. So in that sense, ignorance is an excuse.

Given the conflicting arguments and especially given the district court's repeated admonition to the jury that counsel's arguments were neither evidence "nor your instruction on the law," we conclude that the prosecutor's remarks during closing arguments do not constitute plain error.

## B. SUFFICIENCY OF THE EVIDENCE

Vazquez moved for a judgment of acquittal under Fed.R.Crim.P. 29 on grounds of insufficiency of the evidence at the close of the government's case and restated his motion at the close of all the evidence. The district court denied both motions. Vazquez contends that under the retroactively applicable *Ratzlaf* decision it was error to do so.

■ Whether there is sufficient evidence to support a jury verdict is a question of law subject to *de novo* review. *United States v. Brown*, 40 F.3d 1218, 1221 (11th Cir.1994). We view the evidence in the light most favorable to the government, making all reasonable inferences and credibility choices in favor of the jury verdict, and determine whether the jury could have found the defendant guilty beyond a reasonable doubt. *E.g.*, *United States v. Young*, 39 F.3d 1561, 1565 (11th Cir.1994). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt," but we must reverse the conviction if the record reveals a lack of substantial evidence from which a factfinder could find guilt beyond a reasonable doubt. *Brown*, 40 F.3d at 1221–22 (citations omitted) (quotation marks omitted).

As did the defendant in *Ratzlaf*, Vazquez concedes for the purposes of this appeal that there was sufficient evidence to establish that he structured his transactions and that he acted with the purpose of avoiding the CTR requirements. He contends, however, that the government presented no evidence suggesting that he knew it was illegal to structure his cash deposits. Vazquez argues that, if anything, the obvious nature of many of his banking activities—deposits made only minutes apart and often with the same teller—demonstrates his ignorance of the fact that these actions were contrary to the law.

In response, the government makes two arguments in support of its contention that sufficient evidence existed to prove that Vazquez knew his activities were illegal. First, the government suggests that there was circumstantial evidence based on Vazquez's conduct from which the jury could infer that he had the requisite knowledge. Second, the government argues that the jury was free to disbelieve Vazquez's testimony at trial and find that Vazquez knew he was breaking the law. With *Ratzlaf* as our guide, we examine these two arguments separately.

### 1. Evidence of Vazquez's Conduct

■ The Supreme Court observed in *Ratzlaf* that a jury could find that a defendant knew his structuring activity was illegal "by drawing reasonable inferences from the evidence of defendant's conduct." —— U.S. at ——, 114 S.Ct. at 663 n. 19; *see also United States v. Macko*, 994 F.2d 1526, 1533 (11th Cir.1993) ("Circumstantial evidence may prove knowledge and intent."). *But cf. United States v. Granda*, 565 F.2d 922, 926 (5th Cir.1978) (explaining that proof of knowledge that one is required to file a report for bringing currency in excess of $5,000 into the country "is almost impossible unless affirmative steps are taken by the government to make the laws' requirements known").

The government argues that a reasonable jury could infer from the circumstances surrounding Vazquez's behavior and banking practices that Vazquez knew his conduct was illegal. In particular, the government emphasizes the following facts established by the evidence: (1) Ms. Bermejo, a branch

manager at Ponce de Leon Federal, told Vazquez about the reporting requirements for cash transactions over $10,000; (2) Vazquez subsequently transferred his bank account to Barnett; (3) Vazquez stated to a bank teller that he wanted to avoid a CTR for a particular transaction; (4) Vazquez's checks were all in amounts of less than $10,000; (5) Vazquez's general banking patterns were suspicious, particularly his making multiple deposits only minutes apart and with different branches during the same day; and (6) Vazquez often got other persons to make deposits for him. According to the government, a jury could infer from this evidence that while Vazquez knew about the CTR requirements, he did not realize that Barnett Bank would aggregate multiple deposits during the day. The government argues that a trier of fact consequently could reasonably conclude that Vazquez's many deposits "were designed to circumvent the CTR reporting requirement."

Although we agree that this evidence is sufficient to prove that Vazquez structured his deposits in order to evade the CTR requirements, it does not in any way suggest what *Ratzlaf* requires—that Vazquez knew structuring was illegal. The evidence of Vazquez's conduct provides ample support for a finding that Vazquez knew that Barnett Bank had to file CTRs with the government for cash transactions exceeding $10,000 and that his deposits were designed to prevent the bank from filing these reports. Indeed, he concedes as much in this appeal. Evidence demonstrating that Vazquez wanted to evade the bank's reporting requirements, however, is not adequate to show that Vazquez knew the law prohibited him from doing so. *See United States v. Oreira*, 29 F.3d 185, 188 (5th Cir.1994) ("The Government directs our attention to the considerable evidence of intentional structuring, but this is not necessarily equivalent to an intent to do something illegal."). *But cf. United States v. Marder*, 48 F.3d 564, 574 (1st Cir. 1995) (explaining that defendant's use of

three different banks to conceal his structuring went beyond mere avoidance of the reporting requirement and tended to prove knowledge of illegality). We would disregard the holding of *Ratzlaf* were we to conclude that evidence that establishes structuring also establishes knowledge of illegality.

### 2. Vazquez's Trial Testimony

■ In addition to inferences drawn from Vazquez's banking activities, the government argues that the jury could have disbelieved Vazquez's trial testimony and regarded his false testimony as evidence of guilt. This Court has established that when a defendant takes the stand in a criminal case and exposes his demeanor to the jury, the jury may make adverse determinations about his credibility and reject his explanation as a complete fabrication. *United States v. Goggin*, 853 F.2d 843, 846 (11th Cir.1988). "The jury may view defendant's false explanatory statement as substantive evidence proving guilt." *United States v. Allison*, 908 F.2d 1531, 1535 (11th Cir.1990), *cert. denied*, 500 U.S. 904, 111 S.Ct. 1681, 114 L.Ed.2d 77 (1991); *accord, United States v. Brown*, 53 F.3d 312 (11th Cir.1995); *United States v. Howard*, 895 F.2d 722, 724–25 (11th Cir.), *cert. denied*, 497 U.S. 1030, 110 S.Ct. 3286, 111 L.Ed.2d 794 (1990); *United States v. Bennett*, 848 F.2d 1134, 1139 (11th Cir.1988); *United States v. Cotton*, 770 F.2d 940, 945 (11th Cir.1985); *United States v. Eley*, 723 F.2d 1522, 1525 (11th Cir.1984). We have recently noted that "[t]his rule applies with special force where the elements to be proved for a conviction include highly subjective elements: for example, the defendant's intent or knowledge...." *Brown*, 53 F.3d at 315.[10]

Although much of Vazquez's testimony consisted of his denials that he structured deposits with the bank to evade the reporting requirements and his alternative explanation for his banking activities, Vazquez did specifically testify at one point during the trial

---

10. At least where the court does not reserve a ruling on the motion, Fed.R.Crim.P. 29(b), a defendant who presents evidence waives the right to appeal the denial of his Rule 29 motion made at the close of the government's case.

Therefore, we evaluate Vazquez's insufficiency of the evidence challenge by considering all the evidence produced at trial. *See Brown*, 53 F.3d at 314 n. 3.

about his knowledge that he was acting illegally. On cross-examination, he testified as follows:

Q. Well, during this entire time, you knew you were doing something wrong, didn't you?

A. Correct.

Q. You knew you were doing something illegal, didn't you?

A. Correct.

Q. And you didn't want to get caught, did you?

A. No.

Q. You didn't want anybody to know what you were doing, did you?

A. Yes, but I would like to give an explanation regarding this.

THE COURT: Very well.

THE WITNESS: What I would like to clear up is that I didn't want them to find out. And when I say them, what I mean is the tellers. I didn't want the tellers to find out that I was cashing the checks. And I want to say that this is the only thing, this is exclusively the only thing that I didn't want the bank to know what I was doing.

Q. You didn't want the government to know what you were doing because it was illegal; right?

A. Correct.

Thus, Vazquez testified that he knew he was "doing something illegal," but that the only illegal activity he was hiding from the bank was his check-kiting practice.

█ We believe that this testimony is sufficient for a reasonable trier of fact to conclude that Vazquez knew that structuring was illegal. Although the jury could have believed Vazquez's testimony about what he knew was illegal and was trying to hide, it was also entitled to reject his explanation and " 'conclude the opposite of his testimony is true.' " *Brown*, 53 F.3d at 314 (quoting *Atkins v. Singletary*, 965 F.2d 952, 961 n. 7 (11th Cir.1992)); *accord United States v. Sharif*, 893 F.2d 1212, 1214 (11th Cir.1990). Instead of accepting Vazquez's testimony that he was "exclusively" trying to conceal his illegal check-kiting, the jury could reject that explanation and infer that Vazquez also knew that structuring his deposits was illegal and that he was trying to hide that conduct from the bank. As we have explained before, when a defendant elects to testify, he subjects himself to an evaluation of his credibility by the trier of fact and runs the risk that he might bolster the government's case rather than help his own cause. *Howard*, 895 F.2d at 724–25.

## C. SENTENCING

Vazquez makes two challenges to his sentence: first, that his sentence was wrongfully enhanced; and second, that we should require the district court to resentence him in light of a subsequent amendment to the Sentencing Guidelines.

### 1. Enhancement for Criminally Derived Property

█ Vazquez contends that the district court's imposition of a four-level enhancement of his base offense level was improper. Under the applicable Sentencing Guideline at the time of Vazquez's sentencing, a defendant's base offense level for a structuring conviction was thirteen. United States Sentencing Guidelines § 2S1.3(a) (1992). The Guideline also provided for an increase of four levels if the defendant "knew or believed that the funds were criminally derived property." U.S.S.G. § 2S1.3(b)(1). The Presentence Report ("PSR") observed that, although Vazquez was only charged with structuring transactions amounting to $1.5 million, a total of approximately $7.5 million had been processed through the four accounts controlled by Vazquez and his co-conspirator, Vermeul. Based on the amount of money involved and the fact that Vazquez's legitimate income did not support another explanation, the PSR stated that Vazquez could not have believed his money came from a legitimate source. At the sentencing hearing, the district court found Vazquez's check-kiting story "incredible." In overruling Vazquez's objection to the four-level enhancement under U.S.S.G. § 2S1.3(b)(1), the court found that, even though it would never know with certainty what the source of the money was, it was convinced that Vazquez

"was being used" and that the funds involved "were derived from some illegal activity." Vazquez made a timely objection to the adjustment of his sentence. We review the district court's factual findings at sentencing under the clearly erroneous standard. *United States v. Malgoza*, 2 F.3d 1107, 1110 (11th Cir.1993).

Vazquez argues that there was no evidence presented at trial to suggest that the deposited cash was "criminally derived" or that Vazquez knew or believed it was. Thus, he contends, the district court's enhancement of Vazquez's sentence was based on speculation and was clearly erroneous. *See, e.g., United States v. Wilson*, 993 F.2d 214, 218 (11th Cir.1993) ("[T]he district court must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines."). The government responds that having rejected the check-kiting story as untruthful, the district court was left with a carpenter whose annual income did not exceed $15,000, but who had structured $1.5 million in cash through his bank accounts.[11]

We hold that the district court's finding that Vazquez knew or believed his funds were criminally derived is not clearly erroneous. As explained in our sufficiency of the evidence discussion, a factfinder may reject a defendant's story as not credible and use it as substantive evidence of his guilt. The district court in this case did just that and was entitled to infer from Vazquez's false explanation that he was "being used" as a cover for some type of criminal endeavor. *See, e.g., United States v. Bennett*, 848 F.2d 1134, 1139 (11th Cir.1988) ("[T]he [defendants'] explanation of their activities was dubious, if not wholly incredible. A reasonable jury might well disbelieve the explanation and conclude that the [defendants] were lying in an attempt to cover up illegal activities."); *United States v. Eley*, 723 F.2d 1522, 1525 (11th Cir.1984) ("[W]holly incredible explanations may also form a sufficient basis to allow the jury to find that the defendant had the requisite guilty knowledge."). This infer-

ence, combined with the amount of money involved, is adequate evidence to support the district court's finding.

### 2. Retroactive Application of U.S.S.G. § 2S1.3

■ Finally, Vazquez asks this Court to direct the district court to resentence him according to the modified version of U.S.S.G. § 2S1.3. Since Vazquez's sentencing, § 2S1.3 has been amended to lower both the base offense level of his offense from thirteen to six and the "criminally derived property" adjustment from four to two. *See* U.S.S.G. § 2S1.3 (1993).

Both the relevant federal statute and the Sentencing Guidelines provide that a court has the discretion to decide whether to retroactively apply an amended Guideline to reduce the length of incarceration. Under 18 U.S.C.A. § 3582(c)(2) (West Supp.1994), if a defendant was sentenced according to a sentencing range that subsequently has been lowered by the Sentencing Commission, a court "may reduce the term of imprisonment ... if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The relevant policy statement, U.S.S.G. § 1B1.10, p.s. (1993), states that when a Guideline range is lowered as a result of one of the enumerated amendments in subsection (d) of § 1B1.10, "a reduction in the defendant's term of imprisonment may be considered." U.S.S.G. § 1B1.10(a). Amendment 490, which modified § 2S1.3, is one of the specified amendments covered by this policy statement. *See* U.S.S.G. § 1B1.10(d).

Vazquez requests that we follow the approach taken in *United States v. Park*, 951 F.2d 634, 635–36 (5th Cir.1992). In *Park*, the court, also faced with the question of whether to retroactively apply an amendment listed in section 1B1.10(d), held that the amendment "should be applied retroactively" under the facts of that case and remanded the case to the district court for resentencing under the newer version of the Guideline. *Id.* at 636.

---

11. The district court did not find, and the government does not contend, that Vazquez's check-kiting conduct would suffice to make his funds "criminally derived." Thus, we do not address that issue.

We decline to follow *Park* to the extent it suggests that this Court should determine in the first instance on appeal whether Vazquez is entitled to retroactive application of the amended version of a Sentencing Guideline. Instead, we follow the approach adopted in *United States v. Marcello,* 13 F.3d 752, 756–58, 761 (3rd Cir.1994); *United States v. Coohey,* 11 F.3d 97, 101 (8th Cir.1993); *United States v. Wales,* 977 F.2d 1323, 1327–28 (9th Cir.1992); and *United States v. Connell,* 960 F.2d 191, 197 (1st Cir.1992). In those cases, the other circuits did not vacate the defendant's sentence, but remanded to the district court to determine in its discretion whether or not an adjustment was warranted in light of an ameliorative amendment. As the First Circuit explained:

> [W]hile [the defendant] is not necessarily entitled to a reduction in the offense level—section 1B1.10(a) does not mandate the use of the lesser enhancement, but merely affords the sentencing court discretion to utilize it—he is entitled to have his sentence reviewed in light of the amendment.
>
> When, after a defendant has been sentenced, a guideline amendment occurs under circumstances in which the defendant becomes eligible for, but not automatically entitled to, a reduced sentence, we think it is preferable that the matter of sentence reduction be considered in the first instance by the sentencing court, not by an appellate court.

*Connell,* 960 F.2d at 197.

Because both 18 U.S.C. § 3582 and U.S.S.G. § 1B1.10 give a court discretion to determine whether to retroactively apply a new Guideline that would reduce a defendant's sentence, we agree with the First, Third, Eighth, and Ninth Circuits that the district court, not an appellate court, should be the initial forum to exercise that discretion. To us, this conclusion makes sense, because when a district court is given the discretion to make a choice, "there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call." *In re Rasbury,* 24 F.3d 159, 168 (11th Cir.1994) (discussing parameters of abuse of discretion standard of review).

Therefore, we remand this case to the district court so that it may consider *whether* to retroactively apply § 2S1.3 and resentence Vazquez under the amended version of that Guideline. Although a defendant must ordinarily petition the district court for modification of his sentence under § 1B1.10, *see* 18 U.S.C. § 3582(c)(2), because Vazquez raised the sentencing issue on appeal, we find it unnecessary to require him to take this additional step. *See Marcello,* 13 F.3d at 756 n. 3; *Wales,* 977 F.2d at 1328 n. 3; *Connell,* 960 F.2d at 197 n. 10.

## III. CONCLUSION

The judgment of conviction and sentence is AFFIRMED. The sentence is VACATED and REMANDED so that the district court may determine in the first instance whether to adjust Vazquez's sentence according to the amended version of U.S.S.G. § 2S1.3.