[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**March 22, 2006**
**THOMAS K. KAHN**
**CLERK**

No. 05-13789
Non-Argument Calendar
_____

D. C. Docket No. 04-60265-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICHARD ALLEN HILL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 22, 2006)**

Before CARNES, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Richard Allen Hill is appealing his 21-month sentence for conspiracy to evade the reporting requirements in 31 U.S.C. §§ 5313(a) and 5324, and defrauding the United States for the purpose of impeding, impairing, and defrauding the United States for the purpose of impeding, impairing, and obstructing the lawful functions of the Internal Revenue Service ("IRS"), in violation of 26 U.S.C. § 7201, all in violation of 18 U.S.C. § 371. Hill argues on appeal that the district court erred in determining his base offense level under the United States Federal Guidelines ("federal guidelines").[1] For the reasons set forth more fully below, we affirm.

A federal grand jury returned an indictment charging Hill, along with two co-conspirators, Joseph Steinberg and Anthony Fusco, with committing the above-referenced conspiracy between August 1999 and May 2000. Hill entered into a plea agreement with the government, whereby he agreed to plead guilty to this conspiracy offense, and he acknowledged that the amount of funds that were structured for purposes of relevant conduct, and pursuant to the fraud table in U.S.S.G. § 2F1.1(b)(1), was $902,732.

---

[1] Hill's presentence investigation report ("PSI") reflects that the 2000 edition of the federal guidelines were used to avoid an ex post facto violation because (1) the offense conduct ceased in October 2001, and (2) the 2000 edition was more favorable to Hill.

During Hill's plea colloquy, the government proffered that, as part of the conspiracy, Hill received $902,732 in checks, which were broken up into amounts less than $10,000, with the checks either made out to Hill, or cashed by his employees for him. On further questioning from the court, the government agreed that an "ultimate goal" of the conspiracy was "so [that] someone's tax liability was not fully recognized." The government explained that the IRS would not be able to compute Hill's income from the scheme. However, Hill also acknowledged that another goal of the conspiracy was to avoid reporting requirements.

Hill's PSI included that Tap Pharmaceuticals ("Tap") manufactured drugs and sold them to licensed doctors for Medicaid and Medicare patients at a much lower cost than wholesale prices, so that these physicians could sell the drugs at a lower cost to their patients. Supreme Distributors ("Supreme"), a licensed wholesale-distributor company, bought wholesale-prescription drugs from other licensed wholesale distributors and then sold these drugs to other wholesalers or pharmacies. In April 2000, Supreme contacted the Federal Drug Administration ("FDA") about a shipment Supreme had received from Ideal Marketing Concepts ("Ideal"), another licensed wholesale-distribution company that purchased and sold prescription drugs and that had Steinberg, Hill's co-conspirator, as its President

3

and Chief Financial Officer.[2]  The FDA investigation revealed that this shipment from Ideal contained a tampered box of an oncological drug, Neupogen, which had a pharmacy label and a patient name on it,[3] was valued at $80,000, and was regulated by the Food, Drug, and Cosmetic Act.[4]

The PSI further included that Hill, who was a licensed osteopathic physician in the State of Florida, would receive prescription drugs from Tap and other sources and then sell them to Ideal in exchange for either checks or cash.  If Ideal paid Hill by check, each check was structured to be less than $10,000.  Hill was responsible for using nominee bank accounts, a check-cashing store, and his employees to cash checks in the total stipulated amount of $902,732, with all of these transactions structured to avoid currency-transaction reports.  Hill then would use these sale proceeds to purchase assets and place them in the names of various

---

[2]  Hill agreed during his plea colloquy that, when Steinberg was incarcerated on state charges from October 1999 through May 2000, Steinberg hired co-conspirator Fusco to assume his duties as Ideal's Chief Financial Officer.

[3]  The patient whose name was on the pharmacy label revealed that he was a Medicare patient who had sold the Neupogen to his social worker, who then had resold the drug to one of Steinberg's associates.

[4]  The PSI explained that, in accordance with statutes and regulations that cover how wholesale-prescription drugs are sold and purchased, a paper trail, which is referred to as a "pedigree," must follow a drug from the point of origin to the point of dispensing, and the shipment of prescription drugs from the manufacturer to various wholesalers, up and to the point of resale at a pharmacy.  This pedigree, which includes the name of the previous owner, the drug itself, and a National Drug Code Number, is necessary so that, in the event of a manufacture recall, the product can be traced and recalled.

nominees, who were mainly members of Hill's family. During 1999, Hill failed to report at least $532,364 of taxable income, which amount was derived from checks drawn on Ideal's bank account, and which resulted in a tax liability of $202,390.

In addition to summarizing this offense conduct, the PSI calculated Hill's offense level pursuant to U.S.S.G. § 2S1.3 (2000)—the guideline applicable to offenses involving "Structuring to Evade Reporting Requirements." Under § 2S1.3(a), the PSI began with an offense level of 6, and then added the number of offense levels from the fraud and deceit table in § 2F1.1 that corresponded to the value of the funds relevant to the conspiracy. Because the stipulated amount of funds was $902,732, the PSI added 11 levels, resulting in Hill having a total base offense level of 17. Moreover, because Hill knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity, this level was increased two levels, pursuant to U.S.S.G. § 2S1.3(b)(1).

Hill objected that his PSI incorrectly calculated his base offense level and also increased it two levels, pursuant to § 2S1.3(a) and (b)(1), because the offense conduct did not involve money laundering or any illegal activity. The probation officer responded that, because Hill pled guilty to both objects of the conspiracy, including evading the reporting requirements in §§ 5313 and 5324, § 2S1.3 was the proper guideline to use in calculating his offense level. The probation officer also

5

explained that, although Hill bought and sold some drugs legitimately, he illegally (1) routinely bought drugs from Medicare and Medicaid patients through "runners," and (2) resold drugs that had been re-labeled or re-packaged.

At sentencing, the district court discussed that, although the federal guidelines now were advisory, both the Supreme Court and this Court had explained that district courts still must consult these guidelines, which includes properly calculating them. Hill then renewed his objection to the PSI's calculation of his offense level under § 2S1.3(a) & (b)(1). The government, in turn, offered the testimony of Eric Larson, a Special Agent with the FDA assigned to investigate the case, who testified as follows about information he learned from interviewing employees and business associates of Hill. As part of the instant conspiracy, Hill was engaged in the unlicensed wholesale distribution of prescription drugs, such as Serostim, Neupogen, and Lupron, which were used primarily for treating cancer and AIDS. Hill obtained some of his prescription drugs from Michael Deagan, an unlicensed "street dealer," who delivered these drugs to Hill's office in a black bag, and who reported profits of $50,000 to $75,000 from his Serostim sales to Hill. Hill, in turn, was Ideal's main supplier of Serostim, selling them through Steinberg's associates, Wall and Jay Vegotsky. After receiving drugs from Hill and other physicians, as well as from other unlicensed wholesalers, via "runners"

6

who went to these sources, Ideal sold these drugs to Supreme and other licensed wholesalers, without disclosing the true illegal sources and chain of pedigree of the drugs, in violation of 21 U.S.C. §§ 331 and 333.[5]

The government argued that the offense level provided by § 2S1.3(b)(1) was applicable because (1) one object of the conspiracy involved structuring financial transactions to avoid reporting requirements, and (2) Hill knew or believed that the relevant funds were from purchases and sales of prescription drugs from an unlicensed wholesaler and, thus, the proceeds of unlawful activity. Hill responded that, because the government failed to charge, and Hill did not admit during his plea colloquy, that the relevant funds were the proceeds of unlawful activity, it could not be a factor in determining his sentence. Hill also contended that evidence showing that he purchased quantities of pharmaceuticals on the "gray market" did not establish that the underlying conduct was illegal.

Based on its determination that the government had established by the preponderance of the evidence that Hill knew or believed that the funds involved either were the proceeds of unlawful activity, or were intended to promote

---

[5] The PSI further discussed that, at Ideal, the patient labels on the drugs would be removed and repackaged, using a heat gun and shrink wrap, such that the invoices and pedigrees contained false information regarding the drug's origin, age, and National Drug Code Number.

7

unlawful activity, the court overruled Hill's objection to setting his offense level

pursuant to § 2S1.3. The court explained as follows:

> Dr. Hill being a licensed medical doctor. Drugs that are issued in the name of other people, and we are not talking, by the way, about, for instance, say, a stronger Aspirin or something else you need a doctor's prescription for, but we are talking about highly regulated drugs that are very, very expensive. I think the Neopogen was valued at somewhere [between] $1[,]500 or $1[,]700 for a small vial of it. These are anti-cancer drugs, and some of these drugs were, obviously, labeled for other patients.
>
> We know, ultimately, when they were received at Ideal, the patients names were removed, [the PSI] talks about the process for removing labels and repackaging them, so on, so forth. No effort at maintaining the pedigree which is so important in this area so if there is a need to recall the drugs, that could be done, and the transactions are just huge. It is remarkable that we are talking about transactions, [$]50 to $75,000 in terms of quantity. We are looking at a doctor purchasing these drugs from someone who is unlicenced.

Furthermore, the court rejected Hill's argument that the court, nevertheless,

should apply the cross reference in § 2S1.3(c) and, thus, the tax table in U.S.S.G.

§ 2T4.1, because the conspiracy did not involve a tax offense as its only object.

After concluding that Hill had a resulting guideline range of 27 to 33 months'

imprisonment, and after granting the government's motion for a downward

departure based on substantial assistance, pursuant to U.S.S.G. § 5K1.1, the court

sentenced Hill to 21 months' imprisonment, constituting a sentence below Hill's

advisory guideline range, 2 years' supervised release, and $202,390 in restitution.

8

Hill argues on appeal that the district court erred in calculating and considering his advisory guideline range because, in adopting the PSI's recommended offense level of 17, pursuant to § 2S1.3(a) & (b)(1), the court wrongly concluded that Hill knew or believed that the funds either were proceeds of unlawful activity, or were intended to promote unlawful activity. Hill also contends that the court erred in refusing to apply the cross reference in § 2S1.3(c) to the tax guideline in U.S.S.G. § 2T4.1, when Hill's indictment, plea agreement, and plea colloquy reflected that he was charged with, and pleading guilty to, tax evasion. Additionally, Hill asserts that, although this guideline range only was advisory, this Court should vacate and remand his sentence because, if the advisory range had been lower, a reasonable probability exists that the court would have departed downward below the 21-month sentence that it ultimately imposed.[6]

Post-Booker, we continue to review a district court's factual determinations for clear error. See United States v. Crawford, 407 F.3d 1174, 1178-79 (11th Cir. 2005) (explaining that Booker did not alter either our review of the application of

_____

[6] To the extent Hill's brief can be construed as also arguing that his sentence was imposed in violation of Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), or United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), he was sentenced post-Booker, with the court treating the guidelines as advisory. Thus, no Sixth Amendment violation occurred. See United States v. Chau, 426 F.3d 1318, 1323-24 (11th Cir. 2005) (rejecting the argument that, even when the federal guidelines are applied in an advisory fashion, "the Sixth Amendment right to a jury trial prohibits the sentencing court from making factual determinations that go beyond a defendant's admissions").

9

the guidelines, or our standards of review). We cannot find clear error unless we are "left with a definite and firm conviction that a mistake has been committed." Id. at 1177 (quotation omitted). On the other hand, we review questions of law arising under the federal guidelines de novo. Id. at 1178. Under Booker, we review a defendant's ultimate sentence for reasonableness. See Booker, 543 U.S. at ___, 125 S.Ct. at 765-66. "[T]he district court remains obliged to 'consult' and 'take into account' the [g]uidelines in sentencing." Crawford, 407 F.3d at 1178. "This consultation requirement, at a minimum, obliges the district court to calculate correctly the sentencing range prescribed by the [g]uidelines[.]" Id. (emphasis in original). "After it has made this calculation, the district court may impose a more severe or more lenient sentence as long as the sentence is reasonable." Id. at 1179.

The Currency and Foreign Transactions Reporting Act and its accompanying regulations require banks and other financial institutions to file a report with the government for any cash transactions involving more than $10,000. See 31 U.S.C. § 5313(a); 31 C.F.R. § 103.22(b)(1). A financial institution also must file this report, known as a Currency Transaction Report ("CTR"), if it knows that a person is making multiple transactions in a single day that result in either deposits or withdrawals totaling over $10,000. See 31 C.F.R. § 103.22(c)(2). It is illegal

10

under § 5324 either to cause or attempt to cause a financial institution to fail to file a report, or to structure cash transactions "for the purpose of evading" the filing of a CTR. 31 U.S.C. § 5324(a)(1) & (3). This anti-structuring law "aims to prevent people from either causing a bank to fail to file a required report or defeating the government's efforts to identify large cash transactions by splitting up a cash hoard in a manner that avoids triggering a bank's reporting requirements." United States v. Vazquez, 53 F.3d 1216, 1218 (11th Cir. 1995) (quotation omitted).

In examining whether the district court correctly calculated Hill's advisory guideline range based on his conviction for conspiring to, among other things, evade the reporting requirements in § 5313(a) and § 5324, the relevant version of § 2S1.3—the guideline applicable for "Structuring Transactions to Evade Reporting Requirements"—provided for a base offense level of six, "plus the number of offense levels from the table in § 2F1.1 (Fraud and Deceit) corresponding to the value of the funds." U.S.S.G. § 2S1.3(a) (2000). This guideline also provided that, "[i]f the defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity, increase by 2 levels." U.S.S.G. § 2S1.3(b)(1) (2000).

On the other hand, this guideline also provides that:

If (A) subsection (b)(1) does not apply; (B) the defendant did not act with reckless disregard of the source of the funds; (C) the funds were

the proceeds of lawful activity; and (D) the funds were to be used for a lawful purpose, decrease the offense level to level 6.

U.S.S.G. § 2S1.3(b)(2) (2000).  Moreover, under the cross reference in § 2S1.3(c), courts are to apply the "most appropriate guideline from Chapter Two, Part T (Offenses Involving Taxation)" if (1) the offense was committed for the purpose of violating tax laws, and (2) the resulting offense level is greater than that determined above.  U.S.S.G. § 2S1.3(c).

Hill contended at sentencing that § 2S1.3(b)(1) was not applicable, and that he, instead, should have been sentenced under § 2S1.3(b)(2), because the government failed to establish that he "knew or believed that then funds were proceeds of unlawful activity, or were intended to promote unlawful activity." When a defendant objects to a factual finding, such as in the instant case, the government bears the burden of establishing the disputed fact by a preponderance of the evidence.  See United States v. Rodriguez, 398 F.3d 1291, 1296 (11th Cir.), cert. denied, 125 S.Ct. 2935 (2005).

In Vazquez, the defendant argued that the district court improperly enhanced his base offense level under § 2S1.3(b)(1), based on the court's finding that the defendant "knew or believed that the funds were criminally derived property." See Vazquez, 53 F.3d at 1226.  The defendant's PSI reflected that, although the defendant only was charged with structuring transactions amounting to $1.5

12

million, a total of approximately $7.5 million had been processed through the four accounts controlled by the defendant and his co-conspirator, and that this amount far exceeded the defendant's legitimate annual income of $15,000. See id. at 1226-27. The district court found that, although it could not be certain of the source of the money, it did not believe the defendant's alternative story. See id. On appeal, we determined that this factual finding was not clearly erroneous, explaining that the district court was entitled to infer that the defendant's false explanation was a cover for some type of criminal endeavor. See id. at 1227.

In the instant case, Special Agent Larson testified at sentencing that, as part of the instant conspiracy, Hill obtained some of his prescription drugs from Michael Deagan, an unlicensed "street dealer," who delivered these drugs to Hill's office in a black bag, and who reported profits of $50,000 to $75,000 from his Serostim sales to Hill. Special Agent Larson also explained that, after receiving drugs from Hill and other physicians, as well as from other unlicensed wholesalers, via "runners" who went to these sources, Ideal sold these drugs to Supreme and other licensed wholesalers, without disclosing the true illegal sources and chain of pedigree of the drugs, in violation of 21 U.S.C. §§ 331 and 333. The PSI discussed that, at Ideal, the patient labels on the drugs would be removed and repackaged, using a heat gun and shrink wrap, such that the invoices and pedigrees then false

13

information regarding the drug's origin, age, and National Drug Code Number. Thus, similar to the facts in Vazquez, the court did not clearly err in concluding that the government had established by the preponderance of the evidence that Hill knew or believed that the fund involved either were the proceeds of unlawful activity, or were intended to promote unlawful activity. See U.S.S.G. § 2S1.3(b)(1) (2000).

To the extent Hill also is contending that the court erred in failing to apply the cross section referenced in § 2S1.3(c)(1), based on his argument that the conspiracy to which he plead guilty was for the purpose of violating tax laws, he cites in support to the government's comment during his plea colloquy that the "ultimate goal" of the conspiracy was "so someone's tax liability [would] not [be] fully recognized." Hill's two-pronged conspiracy, however, also had as an object for the co-conspirators to evade the reporting requirements in §§ 5313(a) and 5324. Indeed, the government proffered, and Hill agreed during his plea colloquy, that a separate goal of the conspiracy was to avoid reporting requirements. The PSI also included, and Hill failed to refute, that he was responsible for using nominee bank accounts, a check-cashing store, and his employees to cash checks in the total agreed sum of $902,732, with all of these transactions structured to avoid currency transaction reports. Additionally, § 2S1.3(c)(1) was not applicable because the

14

offense level of 16 that would have resulted from the court's application of U.S.S.G. § 2T1.1(a)(1),[7] would have been less than 17—the offense level that resulted from the court's application of § 2S1.3(a) & (b)(1).  See U.S.S.G. § 2S1.3(c) (requiring as a condition that  the resulting offense level from the tax table be greater than the offense level in § 2S1.3).

Accordingly, we conclude that the district court did not clearly err in finding that Hill "knew or believed that then funds were proceeds of unlawful activity, or were intended to promote unlawful activity," for purposes of applying § 2S1.3(a) & (b).  Furthermore, the court did not err in finding inapplicable the cross section referenced in § 2S1.3(c), for violating tax laws.  We, therefore, affirm.

**AFFIRMED.**

---

[7] A base offense level of 16, pursuant to U.S.S.G. § 2T4.1(K), would have been applicable under the tax table in U.S.S.G. § 2T4.1, because the tax loss at issue was $202,390. See U.S.S.G. § 2T4.1(K) (2000) (setting offense level at 16 for offenses involving more than $200,000 in tax losses).