[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 95-5405
_____

D.C. Docket No. 93-594-CR-DTKH


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ADRIAN PIELAGO,
MARIA VARONA,

Defendants-Appellants.


_____

Appeals from the United States District Court
for the Southern District of Florida
_____

**(February 17, 1998)**

Before CARNES, Circuit Judge, and KRAVITCH and REAVLEY[*], Senior
Circuit Judges.

_____

[*]Honorable Thomas M. Reavley, Senior U.S. Circuit Judge for the
Fifth Circuit, sitting by designation.

CARNES, Circuit Judge:

Appellants Maria Varona and Adrian Pielago were jointly indicted, along with two others, in a multi-count indictment. After a one-week trial, a jury found Varona and Pielago guilty of conspiring to possess cocaine with the intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 846. They appeal their convictions and sentences. We reject Varona's sentence arguments without discussion, see 11th Cir. Rule 36-1, but two of her conviction-related arguments do warrant discussion, although not acceptance. She contends that the indictment against her should have been dismissed, because the government used her immunized statements to obtain it. She also contends that her conviction must be reversed, because the government's presentation of certain evidence against her at trial violated the proffer agreement. We reject her first contention as devoid of merit, and her second one because she failed to raise the issue in the district court. We do not believe that there was any error involving the proffer agreement, and we are convinced there was no plain error.

Pielago challenges both his conviction and sentence. We reject his conviction-related arguments summarily, see 11th Cir. Rule 36-1. However, we find merit in his contention that his sentence is due to be reversed, because the district court incorrectly calculated his criminal history by treating his prior term of confinement in a community treatment center as a "sentence of imprisonment" for purposes of U.S.S.G. § 4A1.1.

## I. FACTS

In mid-1993, the City of Miami Police Department and the Drug Enforcement Administration (DEA), through surveillance and undercover narcotics purchases, identified the homes of Frank Novaton and Jose Varona ("Jose") as drug distribution locations. The authorities discovered that Jose normally obtained cocaine from Novaton and brought it to his house, where he operated his cocaine distribution business. Further investigation revealed that Adrian Pielago and Jose's wife, Maria Varona ("Varona"), advised and assisted Jose in his drug operation. On November 6, 1993, Jose was arrested after surveillance indicated he was about to sell eight kilograms of cocaine that he had just received from Novaton to a drug dealer named "Carlos." For a short time after Jose's arrest, Novaton, Pielago, "Carlos," and Varona were unaware that Jose had been apprehended and were confused as to his whereabouts. During this confusion, Varona delivered one kilogram of cocaine to "Carlos" in a gray tool box.

Based on the government's investigation and the evidence gathered as a result of Jose's November 6 arrest, in December of 1993 a grand jury indicted Jose, Pielago, Rolando Caceras -- who the government then believed was "Carlos" -- and Varona. The indictment charged them with conspiring to possess cocaine with the intent to distribute it, and possession of cocaine with the intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 846.

3

Initially, Jose and Varona cooperated with the government, and they intended to plead guilty in return for a reduced sentence. Varona signed a proffer agreement, agreeing to give the government information about the conspiracy in return for a promise to consider leniency. The agreement provided for "use immunity," specifying that none of the information or statements Varona provided would be used against her in any criminal proceeding, but it explicitly reserved the government's right to pursue investigative leads derived from Varona's proffered statements and to use any derivative evidence against her. Among her statements to the government, Varona named Carlos Hechavarria as the real "Carlos." The government, satisfied with Varona's proffer, said that it was willing to allow her to plead guilty to a lesser offense, namely, using a telecommunications facility to facilitate a narcotics transaction.

Based on Jose and Varona's statements, the government sought and obtained a superseding indictment which named Carlos Hechavarria as a conspirator and dropped the charges against Caceras. The superseding indictment also added the use of a telecommunications facility charge, in order to allow Varona to plead guilty to that charge.

However, Varona's cooperation ceased when her husband Jose was murdered. Fearing for their lives, Varona and her children were taken into protective custody. Apparently, Jose had been murdered

because he had been cooperating with the government. His plea agreement had specifically required him to testify against his co-conspirators and other drug dealers. With Jose's death, the government needed Varona to testify, but she refused to do so. Because of her refusal, the government rescinded its plea offer. Varona and Pielago went to trial on the superseding indictment.

## II.  DISTRICT COURT PROCEEDINGS

On the first day of trial, after the jury was sworn, Varona moved to dismiss the superseding indictment on the ground that the government had used her statements against her before the grand jury in violation of her proffer agreement.  Because she refused to ask for a mistrial, the district court declined to rule on her motion to dismiss the indictment until after trial, warning her that under United States v. Mechanik, 475 U.S. 66, 106 S. Ct. 938 (1986), a guilty verdict might eliminate her claim.

Hechavarria, who had pleaded guilty, testified for the government at trial, providing much of the evidence against Varona and Pielago.  Varona did not object to introduction of Hechavarria's testimony as a breach of her proffer agreement.  The jury found her and Pielago guilty of conspiring to possess cocaine with the intent to distribute it. However, the jury acquitted Pielago of possessing cocaine, and deadlocked on the possession and

5

telecommunications facility charges against Varona.  Those charges were later dismissed.

Following the verdicts, the district court conducted an evidentiary hearing pursuant to Kastigar v. United States, 406 U.S. 441, 92 S. Ct. 1653 (1972), in order to determine whether the government had violated Varona's proffer agreement.  The court held that the government had not violated the proffer agreement by using Varona's statements to obtain the superseding indictments, because it found that the government had prior knowledge of and independent sources for the evidence used to indict Varona.  Accordingly, the district court denied Varona's motion to dismiss the superseding indictment.

The district court then conducted a sentencing hearing.  At that hearing the court found Varona and Pielago responsible for the nine kilograms of cocaine involved in the conspiracy (the eight confiscated when agents arrested Jose plus the one in the tool box that Varona gave Hechavarria).  Based on that amount of cocaine, the district court determined that both their base offense levels were thirty.  Because Varona had a Category I criminal history, the district court sentenced Varona to 97 months imprisonment, the minimum term for her sentencing range of 97 to 121 months.

The probation officer recommended that Pielago be given seven criminal history points, resulting in a Category IV criminal history.  Pielago objected in part, contending that he should be

6

given one rather than two criminal history points for his 1986 conviction for conspiring to transfer an automatic firearm because his sentence of six months had been served in a community treatment center. The district court disagreed, because it considered the six-month sentence to a community treatment center to be a "sentence of imprisonment" under § 4A1.1, which prescribed two criminal history points. Accordingly, Pielago was given a Category IV criminal history, instead of a Category III. As a result, Pielago's sentencing range was 135 to 168 months. The court sentenced him to 140 months imprisonment.

### III. STANDARDS OF REVIEW

We review the district court's denial of Varona's motion to dismiss the indictment for an abuse of discretion. See United States v. Thompson, 25 F.3d 1558, 1562 (11th Cir. 1994). Because Varona did not object to Hechavarria's testimony at trial, we review only for plain error the admission of that testimony. See Fed. R. Crim. P. 52(b). Finally, we review the district court's interpretation of the sentencing guidelines de novo. See United States v. Coe, 79 F.3d 126, 127 (11th Cir. 1996).

7

## IV.  DISCUSSION

### A.  WHETHER THE SUPERSEDING INDICTMENT SHOULD HAVE BEEN DISMISSED

Varona challenges the district court's denial of her motion to dismiss the superseding indictment.  Because the grand jury which issued the superseding indictment heard her immunized statements, she contends that indictment should have been dismissed.  Varona relies on United States v. Tantalo , 680 F.2d 903, 909 (2d Cir. 1982), in which the Second Circuit adopted a per se rule that an indictment must be dismissed as to any defendant whose immunized statement or testimony was heard by the grand jury returning the indictment.  However, to the extent that Tantalo establishes a per se rule[1], we disagree with it.  We have never accepted a per se rule for dismissing indictments obtained as a result of a defendant's immunized testimony; the facts of this case show why a per se rule is inappropriate.

---

[1]The Tantalo Court held that a superseding indictment should have been dismissed where the government obtained an additional count, for which the defendant was ultimately convicted, by using the defendant's immunized testimony before the grand jury.  See 680 F.2d at 904-06.  Although the Second Circuit stated that the whole indictment should have been dismissed "as a matter of law," see id. at 909, we are not sure it intended a broad rule requiring that the indictment be dismissed in every instance where the government uses immunized testimony to obtain a superseding indictment.  The Second Circuit reversed the defendant's conviction because the government failed to make a showing that it had legitimately obtained the information upon which it indicted the defendant, and the trial court failed to conduct a Kastigar hearing on the matter.  See id. at 908-09.  The circumstances of this case are different.

8

The grand jury returned the original indictment against Varona based on the testimony of a DEA case agent named Lucas. Subsequently, Varona made her proffer statements inculpating Hechavarria. Later, the same grand jury heard Agent Lucas' recitation of Varona's proffer statements and returned the superseding indictment. The superseding indictment reflected but two substantive changes: (1) Hechavarria was substituted for Caceras in the conspiracy count; and (2) a count for using a telecommunications facility to facilitate a narcotics transaction was added against Varona.

It is clear that the addition of the telecommunications facility count was harmless; that charge was dismissed after the jury deadlocked on it. So, too, was the change in the conspiracy count. Varona does not challenge the validity of the conspiracy count in the original indictment, nor does she contend that there would have been a material variance between the proof and the indictment if that court had not been modified. Varona's proffer statements were only used "against" her to accuse her of conspiring with Jose, Pielago, and Hechavarria, instead of with Jose, Pielago, and Caceras. Either way, she was still on the hook for her participation in the conspiracy; it matters not with whom she shared that hook. See, e.g., United States v. Davis, 679 F.2d 845, 851 (11th Cir. 1982)("The existence of the conspiracy agreement rather than the identity of those who agree is the essential

9

element to prove conspiracy."). Therefore, the use of Varona's proffer statement resulting in a change of the indictment did not prejudice her. Accordingly, the district court did not abuse its discretion in refusing to dismiss the superseding indictment.

### B. WHETHER THE GOVERNMENT VIOLATED THE PROFFER AGREEMENT BY USING HECHAVARRIA AS A WITNESS AGAINST HER

Because Varona did not object to the government calling Hechavarria as a witness, we can only reverse her conviction if it was plain error for the district court to allow him to testify. See Fed. R. Crim. P. 52(b). The plain error rule places a daunting obstacle before Varona. In United States v. Olano, 507 U.S. 725, 732, 116 S. Ct. 1770, 1776 (1993), the Supreme Court held that for a judgment to be reversed for plain error, three conditions must exist: (1) a legal error must have been committed; (2) that error must be plain; and (3) the error must have affected the substantial rights of the appellant.

Even if all three requirements are met, it is still within the court of appeals' discretion whether to correct the forfeited error. See United States v. King, 73 F.3d 1564, 1572 (11th Cir. 1996); United States v. Vasquez, 53 F.3d 1216, 1221 (11th Cir, 1995). Moreover, that discretion may be exercised "to notice a forfeited error only if . . . the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Johnson v. United States, --- U.S. ---, ---, 117 S.

10

Ct. 1544, 1549 (1997); accord United States v. Gaudin, 515 U.S. 506, 527, 115 S. Ct. 2310, 2322 (1995)("A court of appeals should not exercise that discretion unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings")(internal quotation marks and brackets omitted).

The narrowness of the plain error rule is a reflection of the importance, indeed necessity, of the contemporaneous objection rule to which it is an exception. The contemporaneous objection rule fosters finality of judgment and deters "sandbagging," saving an issue for appeal in hopes of having another shot at trial if the first one misses. See, e.g., Esslinger v. Davis, 44 F.3d 1515, 1525 and n.36 (11th Cir. 1995)(contemporaneous objection rule "deters 'sandbagging,' the withholding of claims in an effort to get more than 'one bite at the apple.'"): United States v. Joshi, 896 F.2d 1303, 1307 and n.3 (11th Cir. 1990)(noting "the Supreme Court's 'admonition against "sandbagging" on the part of defense lawyers' who intentionally decline to object to a potentially unconstitutional trial procedure in order to inject reversible error into the proceeding."); Spencer v. Kemp, 781 F.2d 1458, 1473 (11th Cir. 1986)("contemporaneous objection rules prevent a defendant from 'sandbagging,' taking a chance on a jury verdict while reserving his claim in the event of an unfavorable verdict").

The contemporaneous objection rule also promotes the salutary interest of making the trial the main event. Failure to enforce it

11

"tends to detract from the perception of the trial of a criminal case . . . as a decisive and portentous event." Wainwright v. Sykes, 433 U.S. 72, 90, 97 S. Ct. 2497, 2508 (1977). Moreover, requiring timely objections allows trial courts to develop a full record on the issue, consider the matter, and correct any error before substantial judicial resources are wasted on appeal and then in an unnecessary retrial. See United States v. Sorondo, 845 F.2d 945, 948-49 (11th Cir. 1988). A full record and a prior decision in the district court are essential ingredients to our substantive review of issues -- they flesh out an issue in a way the parties' briefs may not.

"In the absence of plain error . . . it is not our place as an appellate court to second guess the litigants before us and grant them relief they did not request, pursuant to legal theories they did not outline, based on facts they did not relate." Adler v. Duval County School Bd., 112 F.3d 1475, 1481 n.12 (11th Cir. 1997). Because the contemporaneous objection rule is essential to the integrity and efficiency of our judicial process, we have stressed that "[t]he plain error test is difficult to meet." United States v. King, 73 F.3d 1564, 1572 (11th Cir. 1996); accord, e.g., United States v. Sorondo, 845 F.2d at 948-49; United States v. Chaney, 662 F.2d 1148, 1152 n.4 (5th Cir. Unit B 1981). We turn now to application of that test to the issue at hand. Of course, there

12

can be no plain error if there was no error at all. So, we begin with this inquiry: was there any error, plain or not?

Varona's proffer agreement precludes the government from using in criminal proceedings against her any "information or statements" it acquired from her in the course of her cooperation. She contends that the government's use of Hechavarria's testimony, which it acquired only because of Varona's statements, is a breach of the proffer agreement. Therefore, she argues, the district court should not have allowed Hechavarria to testify against her.

The construction of proffer agreements, like plea agreements, is governed generally by the principles of contract law, as we have adapted it for the purposes of criminal law. See United States v. Weaver, 905 F.2d 1466, 1472 (11th Cir. 1990); Rowe v. Griffin, 676 F.2d 524, 528 (11th Cir. 1982) (interpreting immunity agreements pursuant to principles applied to interpretation of plea agreements); cf. United States v. Jefferies, 908 F.2d 1520, 1523 (11th Cir. 1990) ("Plea agreements are interpreted and applied in a manner that is sometimes likened to contractual interpretation."). "This analogy, however, should not be taken too far." Jefferies, 908 F.2d at 1523. A "hyper-technical reading of the written agreement" and "a rigidly literal approach in the construction of language" should not be accepted. In re Arnett, 804 F.2d 1200, 1203 (11th Cir. 1986)(internal citation and quotes omitted). The written agreement should be viewed "against the

13

background of the negotiations." Id. Any ambiguities in the terms of a proffer agreement should be resolved in favor of the criminal defendant. See Rowe, 675 F.2d at 526 n.4.

Paragraph three of the proffer agreement in this case states, in relevant part:

> No information or statement provided by Maria Varona may be used against [her] in this case or any other criminal investigation . . . .

Gov. Ex. 48 at 1-2, para. 3. However, the proffer agreement further provides in paragraph four that:

> The government also expressly reserves the right to pursue any and all investigative leads derived from Maria Varona's statements or information and use such derivative evidence in any criminal or civil proceeding against her and/or others.

Gov. Ex. 48 at 2, para. 4. Those two paragraphs set out two separate terms: (1) the government may not use the information or statements obtained from Varona directly against her, which is to say it may not use them as evidence to obtain an indictment or guilty verdict; but (2) the government may use evidence derived from her information or statements against her to obtain an indictment or guilty verdict.

If only paragraph three existed, we might well agree with Varona and conclude that the government, by using testimony it would not have obtained but for the "information" provided by Varona, violated her proffer agreement. Without the information she provided, the government would not have known that "Carlos" was

14

Hechavarria, instead of Caceras, and therefore would not have indicted Hechavarria. Had the government not indicted Hechavarria, he would have had no incentive to testify against Varona. Therefore, the government "used" Varona's information against her in the broadest sense of the term.

However, paragraph four explicitly allows the government to use evidence derived from the information and statements Varona proffered against her. We do not believe that the two paragraphs, when properly construed, conflict. It is a cardinal principle of contract law that no term of a contract should be construed to be in conflict with another unless no other reasonable construction is possible. See Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994, 1000 (11th Cir. 1991); United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir. 1983). In this case, paragraph four should be read as qualifying, instead of contradicting, paragraph three. Both paragraphs describe the governments' right to use evidence acquired from Varona's proffer. Paragraph three, read together with paragraph four, prohibits the government from directly using the statements and information which made up Varona's proffer against her. Paragraph four correspondingly allows the government to use evidence derived from her proffer statements against Varona. The fact that Varona's trial counsel did not object to Hechavarria's testimony indicates that her lawyer, the same lawyer who negotiated the proffer

15

agreement for Varona, believed then that the government was within its rights to put Hechavarria on the stand.

Moreover, even if the provisions of the two paragraphs conflicted, another contract interpretation principle would vindicate the government's position. When two contract terms conflict, the specific term controls over the general one. See United States Postal Service v. American Postal Workers Union, 922 F.2d 256, 260 (5th Cir. 1991); Boatmen's National Bank of St. Louis v. Smith, 835 F.2d 1200, 1203 (7th Cir. 1987)("Where the document contains both general and specific provisions relating to the same subject, the specific provision controls"). In Varona's proffer agreement, paragraph three is the general provision, using broad language to forbid the government from using statements or information it acquired from Varona against her; paragraph four is the specific term, permitting the government to use evidence it derived from the information and statements she gave against her.

Consistent with paragraph four, the more specifically applicable provision, the government's use of Hechavarria's testimony did not breach the agreement. The government used Varona's proffer statements to indict Hechavarria. As a result of his indictment, Hechavarria decided to cooperate, plead guilty and testify against Varona and Pielago. Therefore, by its very nature, Hechavarria's testimony was derivative evidence. See Black's Law Dictionary 443 (6th Ed. 1991)(defining derivative as "coming from

16

another; taken from something preceding; secondary . . . [a]nything obtained or deduced from another"). The government was only forbidden from introducing Varona's statements and the information she provided into evidence against her, and did not violate the proffer agreement by putting Hechavarria on the stand. Because it would not have been error for the district court to allow Hechavarria to testify even if there had been an objection, there is no plain error.

The dissenting opinion leaves us unmoved. Its position is based upon an interpretation of the term "derivative evidence" in paragraph four that is at variance with the plain meaning of that term. The dissenting opinion constructs a hypothetical involving hidden cocaine, which might be interesting to discuss in an academic setting, but it bears no resemblance to the facts of this case. What happened in this case is that Varona made statements conveying information to the government. The government did not introduce any of those statements into evidence against Varona. Instead, it used what she said to obtain an indictment of Hechavarria. His indictment was derived from Varona's statements and information. Hechavarria's indictment was not evidence against Varona. Instead, the government used Hechavarria's indictment in its successful effort to persuade him to cooperate. Thus, his cooperation including his testimony against Varona was derived, in part, from an indictment which was in turn derived from statements

17

and information Varona gave. We do not think that Hechavarria's testimony, which is two steps removed in the derivative chain from Varona's statements and information, can be considered anything but "derivative evidence," which paragraph four expressly permits the government to use.

Moreover, even if we were to conclude that it was error for the district court to have allowed Hechavarria's testimony, we would not conclude that such an error was plain error. In practice, errors become plain errors in either of two ways. First, an intervening decision of this Court or the Supreme Court squarely on point may make an error plain. See, e.g., United States v. Antonietti, 86 F.3d 206, 208-09 (11th Cir. 1996)(intervening decision of this Court made counting seedlings as marijuana plants plain error); United States v. Walker, 59 F.3d 1196, 1198 (11th Cir. 1995)(intervening decision of the Supreme Court holding the Gun Free School Zone Act unconstitutional made defendant's conviction under the law plain error). Second, errors have been found to be plain where they are particularly egregious, and strike at a core principle which the violated rule or law embodies. See, e.g., United States v. Quinones, 97 F.3d 473, 475 (11th Cir. 1996)(finding plain error where district court failed to ensure that the defendant understood the nature of the charges against him, one of the core principles of Fed. R. Crim. P. 11).

18

The dissenting opinion never satisfactorily explains why, if the error in interpretation it perceives is "plain," that error escaped the attention not only of the district court judge but also of the very defense counsel who negotiated the terms of the agreement. Nor does the dissent adequately explain how such a "plain" error could appear, even after briefing and oral argument, to be no error at all to two-thirds of this panel. We have previously recognized that "no one is perfect, least of all federal appellate judges." United States v. Hogan, 986 F.2d 1364, 1369 (11th Cir. 1993). Notwithstanding that truth, if the "plain" requirement of the Rule 52(b) plain error provision is to have any teeth, when two of the three judges who address a matter conclude that there is no error at all, that must mean there is no plain error. As the Supreme Court has held, "[a]t a minimum, court[s] of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law." United States v. Olano , 507 U.S. 725, 734, 113 S. Ct. 1770, 1777 (1993).

C. WHETHER CONFINEMENT IN A COMMUNITY TREATMENT CENTER IS A
SENTENCE OF IMPRISONMENT FOR THE PURPOSES OF § 4A1.1

Pielago challenges the district court's determination of his criminal history category. Specifically, he argues that the district court should have given him one less criminal history point, because his 1986 six-month sentence to a community treatment center should not have been considered a "sentence of imprisonment"

19

for the purposes of § 4A1.1(b) of the Sentencing Guidelines.  That criminal history point makes a difference, because without it his criminal history category is III, which means a sentencing range of 121 to 151 months instead of 135 to 168 months.  The issue Pielago presents is one of first impression for this Court, although two of our sister circuits have addressed matters relating to it.

We begin, as always, with the text of the Sentencing Guidelines.  U.S.S.G. § 4A1.1 provides, in relevant part:

> The total points from items (a) through (f) determine the criminal history category in the Sentencing Table . . .
>
> (a)   Add 3 points for each prior sentence of imprisonment exceeding one year and one month.
>
> (b)   Add 2 points for each prior sentence of imprisonment of at least sixty days not counted in (a)
>
> (c)   Add 1 point for each prior sentence not counted in (a) or (b), up to a total of 4 points for this item.

Pielago contends that a six-month sentence to a community treatment center falls within subsection (c) instead of (b), because it is not a "sentence of imprisonment."  For a definition of "sentence of imprisonment" within the meaning of § 4A1.1(b) we look to the Sentencing Guidelines' commentary.  Note 1 of the commentary to § 4A1.1 refers us to § 4A1.2 for a definition of the term.  Section 4A1.2(b) states that "sentence of imprisonment means a sentence of incarceration . . . ," a definition that is not particularly helpful to our analysis.

20

Fortunately, the background commentary to § 4A1.1 sheds some light on what the Sentencing Commission meant by a "sentence of imprisonment":

> Subdivisions (a), (b), and (c) of § 4A1.1 distinguish confinement sentences longer than one year and one month, shorter confinement sentences of at least sixty days, and all other sentences, such as confinement sentences of less than sixty days, probation, fines, and residency in a halfway house.

U.S.S.G. § 4A1.1 comment. (backg'd). That commentary makes it clear that a sentence to a halfway house is not a "sentence of imprisonment." But the commentary uses residency in a halfway house as an example, not an exhaustive list of the types of confinement that are not "sentences of imprisonment." The question we must decide, then, is whether for the purposes of § 4A1.1 confinement in a community treatment center equates to residency in a halfway house or instead to a sentence of confinement. Our circuit has no decision close to point.

We begin by looking at how other circuits have answered related questions. In United States v. Rasco, 963 F.2d 132, 135-36 (6th Cir. 1992), the Sixth Circuit concluded that confinement in a community treatment center as a result of a parole revocation was "imprisonment" under § 4A1.2(k). The Rasco Court reasoned that the Sentencing Commission was focusing on the reason for the defendant's confinement, not his place of confinement. See id. at 135. The court explained that because § 4A1.2(k) deals with confinement as a result of parole revocation, the Commission was

21

obviously concerned with the reason why the defendant had been confined, the defendant's failure to stay out of trouble while on parole. See id. at 135-36. Therefore, it was irrelevant where the defendant spent his sentence; only the fact that the his parole had been revoked was determinative. See id. However the Rasco Court did "recognize that this interpretation arguably conflicts with the background commentary to section 4A1.1" Id. at 136.

Whether it conflicts with the commentary or not, Rasco is distinguishable from this case. Section 4A1.2(k), which is concerned with calculating the criminal histories of prior parole violators, implicates a different set of policy concerns than does § 4A1.1. The Sentencing Commission had a reason to more harshly sanction those who have violated parole in the past, even though the resulting incarceration was only in a halfway house or community treatment center. However, Pielago's stay in a community treatment center was not the consequence of a parole violation. He was sentenced directly to that confinement. Therefore, the Rasco Court's reasoning is not applicable to this case. See also United States v. Jones, 107 F.3d 1147, 1161-65 (6th Cir. 1997) (limiting the Rasco decision, and holding that a sentence of home detention is not a "sentence of imprisonment" for § 4A1.1 purposes).

A year later, the Ninth Circuit, addressing exactly the same issue as the Rasco Court, concluded that a term of confinement in a community treatment center is not a "sentence of imprisonment,"

even when it resulted from revocation of parole. In United States v. Latimer, 991 F.2d 1509, 1516 (9th Cir. 1993), the Ninth Circuit declined to follow Rasco, and rejected the idea that the term "sentence of imprisonment" meant anything other than precisely what it says. See id. The Latimer Court based its holding on what the Sixth Circuit acknowledged but failed to be guided by: the background commentary to § 4A1.1. See id. at 1515. Because that commentary distinguishes a term of confinement in a halfway house from a sentence of imprisonment, the Ninth Circuit concluded that the question was whether a term confinement in a community treatment center should be included along with residency in a halfway house as a sentence that is not a "sentence of imprisonment." See id. at 1516. It answered affirmatively, noting that community treatment centers and halfway houses are treated as equivalent forms of punishment throughout the Sentencing Guidelines. See id. at 1512-13.

We agree with the Ninth Circuit's reasoning in Latimer. Several Sentencing Guidelines provisions indicate that the Commission considers confinement in a community treatment center, like confinement in a halfway house, not to be "imprisonment." Section 5C1.1(d) provides that district courts may sentence defendants whose sentencing range is six to ten months to "community confinement" in lieu of part of their sentence of imprisonment. Section 5F1.1 defines "community confinement" as

23

"residence in a community treatment center, halfway house . . . or other community facility." U.S.S.G. § 5F1.1 comment. (n.1). These two provisions indicate that the Sentencing Commission considered a sentence to confinement in a community treatment center to be different from a "sentence of imprisonment."

The Sentencing Guidelines also indicate that community treatment centers and halfway houses are functionally equivalent. Section 2P1.1(b)(3) states that "if the defendant escaped from the non-secure custody of a community corrections center, community treatment center, 'halfway house,' or similar facility, . . . . decrease the offense level by 4 levels." Similarly, § 5B1.4(b)(19) states that "residence in a community treatment center, halfway house or similar facility may be imposed as a condition of probation or supervised release." These two provisions show that the Sentencing Commission considered time served in community treatment centers and halfway houses to be equivalent to each other and distinct from a sentence of imprisonment.

As a matter of fact, in five of the six sections of the Sentencing Guidelines in which the term "halfway house" appears, the term "community treatment center" appears right alongside it. Compare U.S.S.G. §§ 2J1.6(b)(1)(B); 2P1.1(b)(3); 5B1.4(b)(19); 5C1.1(e)(2); 5F1.1 comment. (n.1) with U.S.S.G. § 4A1.1 comment. (backg'd). The only time "halfway house" does not appear with "community treatment center" is in the background commentary to §

24

4A1.1. We do not read any significance into that omission. The Sentencing Commission simply did not make an all-inclusive list there. Instead, "halfway house" is used only as an illustrative example of the types of confinements that are not to be considered "imprisonment" under § 4A1.1.

For these reasons, we join the Ninth Circuit in concluding that a term of confinement in a community treatment center, like residency in a halfway house, is not a "sentence of imprisonment" for the purposes of § 4A1.1. As a result, § 4A1.1(c) applies in this case, and Pielago should have been given only one criminal history point for his 1986 conviction and sentence. Accordingly, his criminal history category should have been III and his sentencing range 121 to 151 months.

## V. CONCLUSION

We AFFIRM Varona's conviction and sentence. We AFFIRM Pielago's conviction, but we VACATE his sentence and REMAND his case to the district court for resentencing.

25